Per Curiam :
This case comes before the court on plaintiffs’ motion, filed January 17,1974, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Thomas J. Lydon, filed December 4, 1973, pursuant to Buie 134(h), defendant having withdrawn its previously filed notice of intention to except. Upon consideration thereof, without oral argument, since the court agrees with the trial judge’s recommended decision, as hereinafter set forth,* it hereby grants the plaintiffs’ motion and adopts the decision as the basis for its judgment in this case. Therefore, judgment is entered for plaintiffs in accordance with the trial judge’s decision with the amount of recovery to be determined pursuant to Buie 131(c)(2).
OPINION OP TRIAL JUDGE
Lydon, Trial Judge:
Plaintiffs[1] seek refund of federal income taxes and interest which they paid for calendar years 1964, 1966 and 1967 arising out of disallowance by the Commissioner of Internal Bevenue (Commissioner) of deductions, as charitable contributions, of the value of eight shares of Pacific States Mortgage Service, Inc., (Service, Inc.) stock which plaintiff gave to San Bafael Military Academy (Academy). The claims in this regard are contained in Counts I, II and III of the petition. In addition, plaintiffs, as transferees of the assets of Pacific States Mortgage Co. (Mortgage Co.), a dissolved corporation, seek refund of federal income taxes and interest which had been paid by Mortgage Co. arising out of (1) disallowance by the Commissioner of deductions for depreciation, for the fiscal year ended June 30, 1966, and the taxable period ending October 27, 1966, of an asset (the right to service a portfolio of loans) which Mortgage Co. had acquired from Service, Inc., *277 and (2) reduction by the Commissioner of the net operating loss carryback claimed by Mortgage Co. for its final taxable period ending December 15, 1966, at which time Mortgage Co. was dissolved and liquidated. The depreciation claims are embodied in Counts IV- and VI and the net operating loss carryback claim is set out in Count VII of the petition. -All of the actions taken by the Commissioner, which are in issue in this case,[2] emanated from his determination that, the transfer of the eight shares of stock mentioned above did not constitute a bona fide gift.
The sole question for decision in this case is' whether DeWitt relinquished complete dominion and control over the’ eight shares of stock he delivered to the Academy :on November 2, 1964 (four shares) and January 5, 1965 (four shares). The parties agree that resolution of this .question will control the disposition of all issues and claims in this case.[3] DeWitt claims he surrendered all dominion and control over the transferred Stock and thus made a boha fide gift of said stock to the Academy and is entitled to all the tax benefits which flow therefrom. Defendant, on the other hand, contends that the delivery of the stock to the Academy was conditioned on the Academy retaining possession of the stock until DeWitt’s controlled corporation submitted an offer at a later time to purchase the stock.
For reasons which follow, it is held that DeWitt made a bona fide gift of eight shares of stock to the Academy..
I
Mortgage Oo., organized in 1952, and incorporated under the laws of the State off Calif ornia, was in the business of originating real estate mortgage loans which it sold to institutional investors, primarily life insurance companies, for a fee or commission. Up until mid-1964, the common stock of *278 Mortgage Co. was Held in equal shares by DeWitt, F. J. Federighi (Federighi) and Arthur T. Beckett (Beckett). In June 1964, Mortgage Co. .redeemed the shares of common stock held by Federighi and Beckett. Thereafter DeWitt was the holder of all outstanding stock and sole owner of Mortgage Co.
Service, Inc., was organized in 1947, and incorporated under laws of the State of California. Its principal business was servicing, for an agreed-upon fee, mortgage loans, i.e., collecting monthly payments from borrowers, remitting sums to investors, maintenance of various trust accounts for taxes, insurance, etc. Service, Inc., serviced the mortgage loan portfolios of lending institutions, mostly eastern insurance companies along with two or three savings banks, within the Oakland, California, metropolitan area. Prior to July 1, 1964, the 60 outstanding shares of no-par common stock of Service, Inc., were held by DeWitt (20 shares), Federighi (20 shares) and Beckett (20 shares).
Mortgage Co. and Service 'Co. operated under common ownership and were in the same physical quarters. In practice, Mortgage Co. would originate real estate mortgage loans and, with the concurrence of institutional investors involved, turn said loans over to Service, Inc., to be serviced. The interrelationship of Mortgage Co. and Service, Inc., did not generate any payment of fees between them. In time, institutional investors formalized the practice whereby “dual contracts” were established under which real estate mortgage loans generated by Mortgage Co. would be serviced automatically by Service, Inc. By June SO, 1965, when Service, Inc., was liquidated, it had the right to service a portfolio of approximately $140 million of mortgage loans held by institutional investors and approximately $22 million of mortgage loans which had not been purchased by outside lending institutions.
By 1964, the business relationships between DeWitt, Federighi and Beckett were not harmonious. As indicated above, DeWitt assumed sole control of Mortgage Co. in June 1964. On or about July 1, 1964, Mortgage Co. purchased Federighi’s 20 shares and Beckett’s 20 shares of common stock in Service, Inc., for an agreed price of $516,000, pay *279 able to each of them, based on the determination that the value of a share of Service, Inc., common stock was $25,800. It is conceded that this was an arm’s-length transaction and the value placed on said shares by the parties deemed fair and reasonable in all respects. As a result of this stock purchase, Mortgage Co. was the holder of two-thirds (40 shares) or 66% percent of the common stock of Service, 'Inc., and DeWitt was the holder of the remaining one-third (20 shares) or 33% percent of the common stock of Service, Inc.
As a result of assuming total control of Mortgage Co. and Service, Inc., DeWitt was in a position to conduct the activities of the two corporations in the manner he thought best. He decided to consolidate the operations of the two corporations by liquidating Service, Inc., into Mortgage Co. In reaching this business decision, he consulted with his attorney. DeWitt, through his attorney, was made aware that any transfer by him of his 20 shares of Service, Inc., stock to Mortgage Co. would not entitle Mortgage Co. to the tax benefits of section 334(b) (2) of the Internal Revenue Code relative to the basis allocation of Service, Inc., assets to be received by Mortgage Co. in any subsequent liquidation of Service, Inc. This was so because DeWitt was the sole owner of Mortgage Co. and thus a related party, a fact which would disqualify Mortgage Co. from the favorable tax provisions of section 334(b) (2).[4] Under the provisions of section 334 (b) (2), Mortgage Co. was required to purchase at least 80 percent of the stock during a 12-month period of Service, Inc., in order to achieve the tax benefits mentioned above. Since Mortgage Co. had already purchased 40 shares ('66% percent) of Service, Inc., stock from Federighi and Beckett on or about July 1, 1964, it need only purchase eight additional shares (13% percent) of Service, Inc., stock on or before June 30,1965, in order to meet the 80 percent purchase *280 requirement of section 384(b) (2). This situation germinated the idea of making a gift of eight shares of Service, Inc., stock.
The tax consequences of giving a gift of the eight shares of stock were considered by DeWitt and his attorney. It was realized that a gift to a charitable institution entailed certain tax benefits and it was further realized that any such gift must be given unconditionally, without any strings attached, if said tax benefits were to be achieved. DeWitt and his attorney both realized that if Mortgage Co. could purchase the eight shares of stock from the donee of any such gift, then dual tax benefits would be available, a charitable contribution deduction under section 170(a) (1) and the favorable tax benefits of section 334(b) (2). These considerations motivated the subsequent actions taken by DeWitt.
Having concluded in October 1964, that a gift of eight shares of Service, Inc., stock should be accomplished, DeWitt, an Episcopalian, felt strongly about giving the stock to an Episcopal institution, either St. Steven’s Episcopal Church in Orinda, California, to which he belonged or San Kafael Military Academy, an Episcopal boys’ secondary boarding and day school for Grades 7 through 12, which had straightened out one of his sons who previous to his enrollment at the Academy was having academic and other problems. Stanford University was also considered as a possible donee. Before reaching a decision in this regard, DeWitt, and his attorney determined that certain inquiries should be made of the Academy. Robert H..Moran, a California attorney who had known DeWitt for 20 years and had represented him and his family on personal and business matters on various occasions was authorized by DeWitt to contact the Academy. Moran was not authorized to make any commitments or agreement on DeWitt’s behalf.
The Academy, located in San Rafael, California, was the property of the Episcopal Church. It was incorporated under the laws of the State of California as a non-profit organization, and was exempt from federal taxation under section. 501 (a) of the Internal Revenue Code. It is conceded that it was at all times material herein a qualified charitable organization under section 170(c) of the Internal Revenue Code *281 to which, a gift, if given, would entitle the donor to a charitable contribution deduction under section 170 ( a).
Academy enrollment was about 260 students, of which about 200 were boarding students and the remainder day students. The campus consisted of between 7-8 acres and was considered inadequate for the expanding needs of the Academy. Tuition was the principal source of Academy funds, running about $2,500 per student per year. The Academy was managed by a Board of Directors or Trustees. The Board of Trustees employed a Business Administrator to manage the business affairs of the Academy and a Headmaster to direct its academic and spiritual affairs. At times material herein, Albert C. Agnew served as the Academy’s Business Administrator and Dr. Sumner Walters, an ordained minister, served as its Headmaster.
On or about October 21, 1964, Moran contacted Agnew by telephone. Moran informed Agnew he was calling on behalf of a prospective donor. DeWitt’s identity was not revealed at this time because he was known to some members of the Board of Trustees and to Agnew and Dr. Walters and had a son then attending the Academy. Under these circumstances, if a gift failed to materialize, it was felt DeWitt might be placed in an awkward situation. Moran inquired of Agnew as to whether the Academy was a charitable non-profit organization, sought information about the Academy and its Board of Trustees, and the relationship between the Academy and the Episcopal Diocese of California. Moran was particularly interested in knowing whether a gift of stock, if given, would belong to the Academy and not automatically become the property of the Episcopal Diocese of California and placed in a common stock fund or endowment fund. Having been advised that any gift would belong to the Academy, Moran inquired whether the Academy had any policies regarding, the receipt of stock as a gift, immediate sale of any such stock in order to convert it into quick cash, or any prohibition against sale of said stock if an offer of purchase was subsequently submitted to the Academy. Moran told Agnew about the donor’s tentative plans, described, infra, and thus placed his inquiries in perspective for Agnew. Agnew • advised Moran he knew of no such policies of the *282 Academy in these areas. In this telephone conversation, no commitment was made by Moran that any gift would be made to the Academy, nor did Moran solicit from Agnew any commitment or agreement that the Academy would act in any way if such a gift were given. Agnew made no commitment or agreement of any kind with Moran on behalf of the Academy during this telephone conversation. Indeed, Agnew was not authorized to make any commitments or agreements which would bind the Academy to a future course of action involving sale of Academy assets.
A day or two following the telephone conversation with Moran, Agnew gave Dr. Walters an oral report on said conversation, which was confirmed in a subsequent “Confidential MemoRAndum” dated November 8,1964, to Dr. Walters. This Memorandum read in part as follows:
•5» !¡! .»[» $
Mr. Moran went on to say that iw (sic) was planned that the assets of the corporation of which the donor is a stockholder would be purchased within six to eight months by a second corporation. The second corporation, according to present plans, would then approach the Academy and seek to buy back the stock of the first corporation and would give the Academy, in return for the stock, an interest bearing note in the sum of at least $200,000.00, possibly more. This interest bearing note would bear interest at 4% and thereby would return the Academy approximately $8,000.00 in interest.
Mr. Moran stated that the Academy was the first choice of the donor as he knew something about the school but that he was also considering such institutions as 'Stanford University, the Episcopal Church, and others.
I described for Mr. Moran the needs of the school as I see them — land, buildings, equipment and etc. and told him of our future hopes and ambitions for the Academy and the boys we serve. He then asked some astute questions concerning the make-up of the Board of Trustees, its fiscal policies and my opinion as to whether or not the Trustees, would immediately seek to sell the stock certificates if they were received and convert them into cash. I told him, that, in my opinion, the Academy’s situation is such that I did not believe that the Trustees would take precipitious (sic) action in this way. I felt that the wishes of the donor would be adheared (sic) to strictly and that the Trustees and the writer have al *283 ways felt a high moral obligation with regard to the terms of any gift or donation. Our conversation proceeded along these lines for about 30 minutes after which time Mr. Moran told me that we would undoubtedly be hearing about this matter in the very near future.
* * i* * *
Both Moran and Agnew agreed that the sentence, “* * * I felt that the wishes of the donor would be adheared (sic) to strictly and that the Trustees and the writer have always felt a high moral obligation with regard to the terms of any gift or donation * * *” related to the end use of any money that might result from any gift, i.e., a donor wished the money to be used for a building program, scholarship fund, etc., and did not relate to the tentative plans described in the paragraph above.
Moran, within a day or two of his conversation with Agnew, communicated with DeWitt. He advised DeWitt that Agnew knew of no Academy policy which would require immediate sale of any stock it might receive as a gift. Further, he advised DeWitt Agnew knew of no Academy policy which would preclude the Academy from considering any offer to sell the stock, if it were given as a gift to the Academy. Aware that no Academy policy existed which would preclude him from trying to implement his tentative plan at a later time, DeWitt decided to make a gift of eight shares of Service, Inc., stock to the Academy.
DeWitt and his wife went to the Academy on November 2, 1964, and met with Dr. Walters and Agnew. At this meeting, DeWitt turned over to the Academy as a gift a certificate representing four shares of Service, Inc., stock. He advised the Academy four additional shares would be given as a gift in 1965. It was at this time that Dr. Walters and Agnew became aware of the identity of the anonymous donor referred to previously. There were no discussions at this meeting as to any conditions or strings being associated with the gift. No mention was made of any prior commitment or future commitment on the part of the Academy to hold the stock until repurchased by DeWitt’s controlled corporation, nor was there any discussion as to what the Academy would or would not do with the stock. Upon receipt of the stock certificate, Agnew had it deposited in the Academy’s safe de *284 posit box in a local bank. On November 11,1964, Dr. Walters wrote DeWitt expressing bis personal thanks for “the most generous gift” DeWitt made to the Academy. He also advised DeWitt that the Board of Trustees would meet later in the month and he would undoubtedly hear from the President of the Board.
The minutes of the regular monthly meeting of the Board of Trustees of the Academy on November 24, 1964, stated in pertinent part:
H» H* «í» í¡»

HEADMASTER'S REPORT:

Dr. Walters preceeded '(sic) his report by announcing the receipt of a gift of stock in the value of approximately $200,000.00. He explained that the gift was from the parents of one of the present cadets at the Academy and that for the present, the donors wish to remain anonymous. It was requested that the trustees not discuss the receipt of the gift beyond the confines of the board meeting room. (A confidential report concerning the details of this gift and the terms under which it was given is attached for your reference.)
Hj # ❖ *

RESOLUTION TO THANK DONOR OF GIFT:

The Rev. Mr. Sinkinson moved a resolution to thank the anonymous donor of the $200,000.00 gift in the name of the Board of Trustees. This motion was seconded by Dr. Lesoine and unanimously (sic) passed.
The “confidential report” mentioned in the above excerpt from the Minutes was undoubtedly the Confidential Memorandum dated November 3,1964, from Agnew to Dr. Walters which was referred to and quoted from previously.
While there is some conflict and uncertainty in the record as to what the Board was told at the November 24 meeting, it is concluded that the Confidential Memorandum provided the Board with the operating facts on which it acted and the circumstances related therein were not construed by the Board as imposing any conditions on the Academy attendant to the acceptance of the gift of stock from DeWitt. The record preponderates in favor of a finding that the Board of Trustees accepted the gift of stock without subjecting itself to any condition that subsequent sale of said stock must le- *285 gaily or morally be to DeWitt. or Ms controlled corporation. Neither DeWitt nor any representative of Ms was advised or informed by any member of the Academy that the stock wMch he gave as a gift would be held until such time as Ms controlled corporation submitted an offer to purchase the stock. There is no credible evidence in the record that there was any agreement between the Board of Trustees and DeWitt that the gift of stock was conditional in any manner.
Dr. Russell W. Bernhard, President of the Academy’s Board of Trustees had previously written DeWitt on November 16, 1964, after he learned from Dr. Walters that a certificate of stock had been delivered as a gift to the Academy, expressing Ms thanks for DeWitt’s “magnificent gift to the school.” On December 8, 1964, Dr. Bernhard wrote DeWitt as follows:
I wish to express the gratitude of the Board of Trustees of San Rafael Military Academy .for the magnificent contribution you are making to our school. By a Resolution passed unanimously at our last meeting, the members of the Board asked that I write to thank you for tMs expression of your great' confidence in the Academy and your wish that it be strengthened and provided for in the future. Your anonymity will be protected until your son graduates or until you request otherwise.
❖ ❖ Hi Hi.
On January 4,1965, DeWitt mailed to the Academy a certificate representing four additional shares of Service, Inc., stock, thereby completing Ms gift of eight shares of Service, Die., stock to the Academy. This certificate was also placed in the Academy’s safe deposit box in a local bank. The Academy acknowledged receipt of this certificate and expressed “enormous appreciation and gratitude” to DeWitt.
Between January 5, 1965, and-April 27, 1965, there were no communications or dealings between the Academy and DeWitt, or any representative of his. The Academy made no effort to try and sell the stock during this period principally because there was no market for stock in a closely-controlled corporation, such as Service, Inc. Under the circumstances, all the Academy could hope for was an offer to purchase the stock by DeWitt’s corporation. ’
*286 On April 27, 1965, DeWitt, together with his attorneys, went to the Academy and met with Dr. Walters, Dr. Bern-hard and Stephen Hackett, Agnew’s replacement as Business Administrator. A letter, signed by DeWitt as President of Mortgage Co. and directed to the attention of Dr. Bernhard, was delivered to the Academy ¡at this time. This letter provided in part:
We ¡believe you to be the owner of eight shares of the outstanding no par value common stock of Pacific States Mortgage Service, Inc., a California corporation.
We are willing to purchase this stock from you for a purchase price of $25,800.00 per share, aggregating $206,400.00 for the eight shares. This offer is for the entire block of eight shares and does not extend to any smaller number of shares.
The purchase price would be paid by the delivery of the Promissory Note of this corporation payable to the order of San Biafael Military Academy or your nominee ■in exchange for the delivery of the stock. Such Promissory Note would be in the face amount of $206,400.00 and would bear interest at the rate of 4% per annum with interest during the first twenty years payable monthly, quarterly, semi-annually or annually as you might prefer. The principal would be payable in equal monthly installments between the 20th and 30th years with monthly payments of interest in addition to the monthly payments of principal.
. This offer is conditioned upon your ownership of the eight shares of common stock with Pacific States Mortgage Service, Inc. and your power to assign same to this company and the assignment and delivery thereof to this company free from all liens and encumbrances whatsoever.
The $206,400 figure set out in the third paragraph of the letter represented the value of the eight shares of Service, Inc., stock, computed on the basis of a value of $25,800 per share, which was the share value utilized when Federighi and Beckett sold their 40 shares of Service, Inc., stock to Mortgage Co. in June 1964. It is not disputed that the eight shares of stock had a fair market value of at least $206,400.
DeWitt was advised that the offer to purchase the stock would have to be presented to Gallaher, attorney for the *287 Board of Trustees and thereafter acted on by the Board. On April 28,1965, Dewitt and his attorneys met with Galla-her and presented the offer to purchase the stock to him.
Gallaher, after looking into the matter, advised the Executive Committee of the Board of Trustees, that he saw no legal objection to acceptance of DeWitt’s offer. He viewed the Academy’s stock as an asset on which it might or might not recover anything. In his opinion the Academy had stock it wasn’t able to do anything with; it was getting nothing for it since the stock produced no dividends and there was no market on the outside for its sale because of the closely-held nature of Service, Inc., stock. On the other hand, he realized that the circumstances attendant to the issuance of the long-term Promissory Note in return for the stock were such that the Note might not be paid off. To him the matter was a gamble either way. Gallaher made no effort to inquire into the value of the stock that the Academy would be giving up. Since the Academy stood a chance to collect some interest imder the Note arrangement, he recommended to the Executive Committee that the offer be accepted.
In the meetings of April 27 and 28, referred to above, no mention was made of any prior agreements, understandings, commitments or discussions concerning the purchase of the stock by Mortgage Co.
The minutes of the meeting of the Executive Committee on May 6,1965, stated:
* * * * *
On Tuesday evening, April 27, at 5:15 p.m. in the Headmaster’s office, Mr. C. C. DeWitt, Jr., President of Pacific States Mortgage Company and his attoumeys (sic) Mr. Brewer and Mr. Moran met with President Bernhard, Dr. Walters, Mr. Agnew, and Mr. Hackett. At that time, Mr. DeWitt presented two letters to President Bernhard and to other persons present in the room.
* * * An identical copy of Mr. DeWitt’s letter to President Bernhard was presented to Mr. Gallaher in his San Francisco office on Wednesday morning, April 28. Mr. Gallaher then wrote to Dr. Walters in essence that: (a) our present stock is of no value and cannot be marketed; (b) Mr. DeWitt’s offer to purchase the stock in exchange for the promissory note cited above will realize a net income of at least $8,000.00 per *288 year for 20 years, plus payments of principal and in- ' terest between the 21st and 30th years of this particular loan; (c) unless we accept Mr. DeWitt’s offer, the School stands to realize no monies at all from its present holdings. Mr. Gallaher, therefore, recommended that the Executive Committee accept Mr. DeWitt’s offer.
Following discussion, it was moVed by Mr. Good and seconded by Dr. Lesoine that: (a) the School accept the terms offered by Mr. DeWitt; (b) Mr. Gallaher be asked to proceed with the necessary steps for the transaction. Motion carried. Following discussion, the Executive Committee agreed that interest should be paid quarterly. Mr. Hackett was instructed to 'ask Mr. Gallaher to report on the transaction at the next meet- ■ ing. óf the Board, May 20,1965, and to give a summary of the entire transaction. .
On May 20, 1965, the Board of . Trustees accepted the recommendation of the Executive Committee and voted to accept DeWitt’s proposal relative to purchase of the stock. The proposal was accepted in its entirety. The Academy did not consider any counter offer relative to any of the terms of the proposal.
The Resolution of the Board of Trustees wherein the Board approved and authorized the offer and sale of stock at the May 20,1965, meeting began as follows:
WHEREAS, San Rafael Military Academy is the owner and holder of eight shares of no par value common stock of Pacific States Mortgage Service, Inc., a California corporation, which were received as a gift fromC. C. DeWitt, Jr.; and ■

% . %

WHEREAS, the Executive Committee after considering the terms of the offer has recommended acceptance and the Legal Counsel has approved the form of the proposed note as corresponding to the terms of the offer;
❖ * v if: * #
On May 21, 1965, a Promissory Note dated May 20,1965, in the face amount of $206,400, bearing interest at the rate of 4 percent per annum, was delivered to the Academy by Mortgage Co. and in return the Academy endorsed over and delivered to Mortgage Co. the eight shares of - Service, Inc., stock. '
*289 The Academy held-the Promissory Note[5] until October 1966. There' is no evidence in the record to indicate, one way or another, whether any interest payments were made to the Academy in accordance with the terms of the Note. In October 1966, under an Agreement And Plan Of Keorganization with United California Bank, a California corporation, and Western Bancorporation, a Delaware corporation, all the assets and liabilities, including the Promissory Note issued to the Academy, of Mortgage Co. were transferred to United California for shares of Western Bancorporation common stock. On or about October 27, 1966, United California paid the Academy $206,400 in exchange for the Promissory Note of May 20,1965.
II
In Commissioner v. Duberstein, 363 U.S. 278, 284-85, 288-89, (1960), the Supreme Court, in refusing to establish a governing standard or test as to what constitutes a gift, stated that the conclusion as to whether a transfer of property amounts to a gift is one that must be reached on consideration of all the facts involved in a particular case. That observation is for application in this case.
The record, as a whole, preponderates in favor of a finding that DeWitt’s delivery of the two certificates representing eight shares of Service, Inc., stock constituted a valid gift. DeWitt intended the delivery of said stock to -be a gift and he satisfactorily surrendered dominion and control over said shares. The Academy accepted arid treated the stock as an unconditional gift at the time it was received,"and thereafter was the legal and beneficial owner of the stock. Further it was free to dispose of said shares in the best interests of the *290 Academy. Indeed, the deliberate and bureaucratic action taken by the Academy following receipt of the offer to purchase the stock militates against a finding that the gift of stock was conditional in nature. See Sheppard v. United States, 176 Ct. Cl. 244, 252, 361 F. 2d 972, 976 (1966). Thus we find in the facts of this case the well-established requisites for concluding that a bona fide gift was made to the Academy by DeWitt. We find donative intent on DeWitt’s part, actual delivery of the stock to the Academy and relinquishment of dominion and control over the stock by DeWitt, as the donor. Carrington v. Commissioner, 476 F. 2d 704, 709 (5th Cir. 1973).
Defendant does not affirmatively challenge DeWitt’s dona-tive intent, nor the actual delivery of the stock to the Academy; but it does contend that DeWitt did not relinquish dominion and control over the stock since it views the transfer of the stock as conditional based on an agreement between DeWitt and the Academy that the Academy would retain the stock until such time as DeWitt, through his controlled corporation, Mortgage Co., offered to repurchase the stock. Since DeWitt subsequently repurchased the stock through his controlled corporation, defendant sees in this fact substance for its view that a conditional agreement did exist when the stock was given to the Academy. This fact, however, is not particularly persuasive here, nor have similar facts had any determinative effect in analogous cases. See Sheppard v. United States, supra; Carrington v. Commissioner, supra; Behrend v. United States, decided December 14, 1972 (4th Cir.), 31 AFTR 2d 73-406 [73-1 USTC ¶9123]; Richard P. Makoff, CCH 26 Tax Ct. Mem. 83, 90 (1967); Robert L. Fox, CCH 27 Tax Ct. Mem. 1001 (1968). Since the eight shares of stock were in a closely-held company, there was little, if any, market for them. Indeed, the only potential buyer was Mortgage Co., DeWitt’s corporation. Thus, it is not surprising that the offer to purchase the stock came from the only likely source available.[6]
*291 Defendant relies on other facts to buttress its view that a conditional gift was given, but analysis also reveals them to be unpersuasive. For example, the Academy received no dividends while it held the stock for the simple reason that no dividends were declared during this period. Further, the record does not indicate that Service, Inc., issued any information to its stockholders during the period the Academy held the stock, and thus the fact the Academy received no such information is meaningless. Again, the fact that the Academy accepted DeWitt’s offer without change and without making an independent determination of the value of the stock is, under the circumstances, of little significance. See Sheppard v. United States, supra, 176 Ct. Cl. at 253, 361 F.2d at 976 in this regard. Defendant refers to the fact that the Academy sold stock worth at least $206,400 and accepted in return a 30-year Promissory Note with a face value of $206,400 and a 4 percent rate of interest. Since the Note had an analytical fair market value of $60,000 at the time it was given defendant concludes that obviously the Academy felt it did not own the stock since one would not ordinarily undersell property which it owned.[7] However, the Academy gave full consideration to the offer of Mortgage Co. to purchase the stock and concluded, under the circumstances, that acceptance of the Promissory Note was in the best interest of the Academy. As Gallaher, the attorney for the Academy observed, in considering the offer to purchase the stock, the *292 Academy as owner of the stock, was getting nothing in the way of cash inflow. Under the Note, the Academy would receive interest payments of $8,000 per year, and it was cash that the Academy was interested in, not stock which produces no income. See Sheppard v. United States, supra, 176 Ct. Cl. at 253, 361 F. 2d at 976. Moreover, the fact that the Note was paid off in full within 17 months of issue weakens the force of defendant’s argument in this regard. Finally, the characterization by the Academy’s outside auditors of the Promissory Note as a gift which the Academy received has little independent factual significance. This comment was contained in one of the Notes to the financial statements which the auditors prepared for the Academy for the fiscal year ended June 30, 1965, and there was no testimony from the auditors or others as to the basis or rationale for such a comment. Grallaher, the Academy’s attorney, deposed that this characterization was incorrect since the stock constituted the gift and the Promissory Note constituted Mortgage Co.’s indebtedness to the Academy following sale of the stock to the company. Under the circumstances, Gallaher’s view rather than the naked comment is the more persuasive evidence.
Three separate incidents, which defendant blends together, constitute the basis for its contention that the Academy and DeWitt agreed that the stock, once given, would be held by the Academy solely for resale to DeWitt’s corporation.
First, defendant relies on the telephone conversation, on or about October 21, 1964, when Moran, as DeWitt’s representative, contacted Agnew, the Academy’s Business Administrator, to advise that a prospective donor was interested in giving a gift to the Academy and inquired as to Academy policies regarding receipt of a gift of stock, immediate resale of any such stock gift and whether a gift to the Academy became the property of the Academy or the Episcopal Diocese of California. Defendant contends that Moran and Agnew reached an agreement during this conversation that the stock, if given, would be held by the Academy for resale to the donor’s controlled corporation. Both Moran and Agnew denied that any such commitment or agreement was made during this telephone conversation. Unquestionably they were in the best position to relate what was said in that *293 telephone conversation. Agnew, on November 3, 1964, reduced Ms understanding of the substance of this conversation to a written Memorandum to Dr. Walters, the Academy-Headmaster, and that Memorandum properly read does not reflect any agreement between Moran or Agnew, or any commitment by the Academy, to hold any stock, if given, until such time as the donor offered to repurchase it. It is true that Moran revealed to Agnew the donor’s tentative plans as to what he hoped to do relative to future purchase of the stock but this fact by itself does not constitute any agreement or commitment and was not so construed by Moran or Agnew. The tentative planning of the donors in Sheppard v. United States, supra; Grove v. Commissioner, decided July 27, 1973 (2nd Cir.), 32 AFTR 2d 73-5523 [73-2 USTC ¶ 9591]; Carrington v. Commissioner, supra; Behrend v. United States, supra; Robert L. Fox, supra; and Apt v. Birmingham, supra, did not affect the validity of subsequent gifts implementing such planning and no basis exists in this case for impugning the validity of the gift of Service, Inc., stock to the Academy merely because the donor made known to the donee the road he hoped to travel in the future.[8]
Second, defendant relies on Dr. Walters’ testimony as to what Agnew orally told him a day or two after his telephone conversation with Moran. Dr. Walters testified that Agnew told him that he assured Moran that if any gift of stock were given, it would be held until such time as DeWitt or his corporation sought to buy it back. Agnew, understandably, some 8 years later at trial could not recall any of the *294 details of this conversation with Dr. Walters. Since Agnew made no such commitment with Moran it is believed he could hardly have so advised Dr. Walters. Moreover, Agnew believed, and the record corroborates this view, that his Memorandum of November 3, 1964, confirming the substance of the telephone conversation with Moran also contained the substance of his oral report to Dr. Walters. Agnew further observed that while he had the greatest respect for Dr. Walters as a person, he created problems for Agnew when Agnew served as Business Administrator for the Academy because Dr. Walters would misinterpret what Agnew said about Academy business affairs. At the time of trial, Dr. Walters was also trying to recall oral conversations which took place some 8 years earlier and it is understandable that some confusion and uncertainty may have clouded his recollection of this oral conversation. One possible explanation for Dr. Walters’ account of this oral conversation with Agnew is the following observation. It is believed, on the basis of the totality of the record, that Dr. Walters relied on the Agnew Memorandum of November 3, 1964, in preparation for testifying in this case and in doing so he interpreted a sentence[9] in the Memorandum as implying that the Academy would upon receipt of the stock hold it for resale to the donor or his controlled corporation since “* * * the wishes of the donor would be adhered to strictly * * The record supports the finding that Agnew never advised Dr. Walters that he and Moran had agreed that the stock would be held by the Academy for resale to the donor or his controlled corporation.
Finally, defendant relies on Dr. Walters’ oral report to the Board of Trustees on November 24, 1964, wherein, he testified, he informed the Board that he and Agnew had advised Moran that the Academy would, if given the stock, hold it until DeWitt sought to buy it back and that the *295 Academy should honor this commitment. Parenthetically, Dr. Walters admitted he never used the word “condition” in advising the Board of the situation but referred at alll times to the “donor’s wishes.”[10] But the evidence of record warrants the finding that no such commitment statement was made to the Board. Dr. Walters never talked with Moran, DeWitt’s representative, and it is conceded that on the one occasion when he met DeWitt, when the initial certificate representing four shares of stock was delivered to the Academy, there was no discussion of any conditions or agreements that the stock would be held for resale to the donor. Dr. Walters’ testimony on which defendant relies in support of its position that there was an agreement between the donor and the Academy, was based entirely on what Agnew told him, and Agnew denied that any commitment was made. As indicated above, Dr. Walters’ misinterpretation of the Agnew Memorandum ostensibly influenced his present recollection of what was actually said 8 years earlier. Agnew was present at the meeting of the 24th but at trial was unable to remember details of Dr. Walters’ oral report to the Board. Agnew believed the Academy was free to sell stock to anyone, after transfer from DeWitt, and this view is incompatible with any report to the Board that the Academy should, or did, commit itself to sale of the stock only to DeWitt. Gallaher also was present at the 24th meeting. At trial he could not remember the details of Dr. Walters’ oral presentation to the Board. His only recollection of what the Board was told was as set out in Agnew’s Memorandum of November 3,1964. Moreover, he testified that if any commitment was made restricting action the Academy could take relative to the stock he certainly would have remembered it. Finally, the minutes of the meeting prepared by Agnew do not contain any account of Dr. Walters’ remarks that the Academy was, or should be, committed to holding the stock solely for resale to DeWitt. While of little independent weight by itself, Dr. Walters believed, at the time the stock was given, that it was a gift, whatever its future cash value might be. Coupled with Dr. Walters’ belief that a gift of *296 stock was given is bis testimony tbat if Gallaber advised tbat DeWitt’s offer to purchase tbe stock was improvident as far as tbe Academy was concerned, he, as a Trustee, would have voted against accepting this offer. Thus Dr. Walters’ testimony in this respect is not compatible with defendant’s contention that tbe Academy was merely a conduit for tbe stock. On this record there is no reasonable-basis'to conclude tbat Dr. Walters informed tbe Board that the Academy should, and the donor was advised it would, bold the stock until such time as DeWitt’s corporation offered to repurchase tbe stock.
It must be borne in mind tbat neither Agnew nor Dr. Walters bad authority to commit tbe Board of Trustees to any given course of action. Parenthetically, Moran had no authority to make any agreement or commitment on behalf of DeWitt. In this record, there is no credible evidence that the Board of Trustees accepted a gift of stock with the condition that said stock would be held until such time as DeWitt offered' to repurchase it. Even if one were to accept completely defendant’s version of the-facts, there is no definitive evidence of any action on the part of the Board of Trustees from which one could reasonably conclude that an agreement existed between DeWitt and the Board attaching conditions to the gift of stock. Agreements to abrogate gifts otherwise bona fide must be comprised of more credible facts than are present in this case. The most that can be said under defendant’s version of the facts is that an understanding may have existed that the Academy anticipated an offer from DeWitt and DeWitt expected to repurchase the stock. However, such an understanding on the part of the donor and donee imposed obligations on neither and thus cannot be said to affect the validity of the gift. Robert L. Fox supra, and the cases cited therein (CCH 27 Tax Ct. Mem. at 1018). There is no contention in this case that Mortgage Co. was obligated to purchase the stock. Defendant, however, does contend that the Academy was obligated to sell the stock to Mortgage Co. on the ground that if it failed to comply with the conditional agreement, under which the stock was given, to accept Mortgage Co.’s offer of purchase at a later time, such refusal would constitute fraud on its part under California law (Civil Code, *297 West’s Ann. Calif. Codes § 1572(4)). The finding, supra, that there was no such conditional agreement is sufficient to dispose of this contention. Moreover, a finding of fraud must rest ondear and convincing evidence of intent to deceive or to induce another to enter into an agreement and this record is barren of any such evidence even if we accept defendant’s version of the facts. See Eastern School v. United States, 180 Ct. Cl. 676, 694-98, 381 F. 2d 421, 432-34 (1967).
Defendant counters plaintiff’s reliance on the fact that there was no written documentation supporting a conditional gift by viewing the absence of any such writing as a neutral fact which neither proves nOr disproves the existence of any condition. However, assuming plaintiff refrained from recording such conditions, since such evidence might destroy any possible tax benefits for him, no such inhibition can reasonably be imputed to the Academy. All letters, minutes and resolutions issued by the Academy manifest an unconditional gift. Indeed, in his letter of December 8, 1965, Dr. Bernhard thanked DeWitt, on behalf of the Board of Trustees, for his “magnificent gift' to the school” and advised, “your anonymity will be protected until your son graduates or until you request otherwise.” It seems reasonable to observe that if the Academy felt itself constrained in the disposition of the stock by some agreement, moral or otherwise, with DeWitt appropriate language would have been utilized by the academy to indicate to DeWitt that his generosity would be rewarded by Academy adherence' to his tentative plan wishes. At the very least, one would believe, if the facts were as defendant suggests, that the Academy would advise DeWitt it would await further word from him. The absence of any written intimation of a commitment under the circumstances, or even an acknowledgment in writing by the Academy President of the tentative plan of the donor is more than a neutral fact. It is supportive of the conclusion that no commitment or agreement was made relative to delivery of the stock to the Academy.
Defendant stresses the fact that DeWitt and his attorney gave thoughtful consideration to the tax aspects of the transactions which they contemplated. However, as the Supreme Court observed in Commissioner v. Duberstein, supra, *298 363 U.S. at 286, “It scarcely needs adding that the parties’ expectations or hopes as to the tax treatment of their conduct in themselves have nothing to do with the matter.” Further, one must always be mindful that a taxpayer is entitled to decrease the amount of his tax liability by means which the law permits, Gregory v. Helvering, 293 U.S. 465 (1935), and is also entitled to choose a transaction method most favorably to him tax wise. Carrington v. Commissioner, supra, at 705. See also Sheppard v. United States, supra. Accordingly, the fact that plaintiff expected to obtain charitable contribution deductions under section 170(a) as a result of his gift of stock to the Academy and thereafter expected that his corporation would be able to purchase the stock from the Academy and thus become entitled to the tax benefits of section 334(b) (2), while establishing tax motivation, sheds little light on the basic question of whether a valid gift was completed when DeWitt delivered the stock to the Academy.
The Commissioner of Internal Eevenue and the courts have been at odds in gift-and-repurchase situations such as confronts us here.[11] While the Commissioner has emphasized the “prearrangement,” “understanding” of the parties and “common identity” of donor and repurchaser aspects relative to gifts of stock, the courts have tended to focus on the narrow circumstances surrounding the actual delivery of the stock.[12] The thrust of decisions involving gift-and-repurchase of stock is that a completed gift takes place when there is donative intent and physical delivery of the stock to the donee — which, without more, implies relinquishment of dominion and control by the donor over such stock. See e.g., Apt v. Birmingham, supra, 89 F. Supp. at 371. These decisions disclose that courts will attach conclusive substance to the form chosen by the parties unless one can demonstrate rather clearly that the form chosen is not an accurate reflection of its substance. Further, they reveal that courts are generally not concerned with what a donee does with the *299 gift thereafter, even if the gift is repurchased shortly after it is given by the donor’s controlled corporation, providing there is no agreement between the donor and donee such as to render the gift a sham, and the donor risks the possibility, however small, that the donee may sell the gift elsewhere. Prearrangements, understandings or tentative planning between the involved parties which do not impose legal obligations on them to either sell or purchase the gift after it is given, will not invalidate the gift. The conclusion in this case that DeWitt made a valid gift of stock to the Academy is consonant with the rationale and holdings of those judicial decisions which have confronted this troublesome gift-and-repurchase tax situation.
conclusion oar law
Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are entitled to recover, together with appropriate interest as provided by law, and judgment is entered to that effect. Unless the parties stipulate the amount of recovery due, that amount will be determined in subsequent proceedings -under Rule 131(c) and in accordance with this opinion.

 Whereas the court adopts the trial Judge’s separate findings of fact, which are set forth in his report filed December 4, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

 Gail G. DeWitt is a party plaintiff only because she filed joint tax returns with her husband. The term “plaintiff” hereinafter will refer to Clinton CL DeWitt (DeWitt).

 Plaintiffs, at trial, stipulated and agreed that the fair market value of a 1959, twin-engine airplane, as of December 15, 1966, was $21,000. This agreement results In dismissal of part of Count II, Count ,V" and part of Count VII of the petition.

 Plaintiffs in their' proposed findings claim depreciation of $36,305.86, covering the period July 1, 1966-October 27, 1966. However, there is no evidence whatsoever to support this figure in the record, under the circumstances, plaintiffs are limited herein to the amount ($23,992.66) of depreciation claimed in their petition (Count VI) and claimed previously before the Commissioner.

 For example, before liquidation the basis of Service, Inc.’s right to service the loan portfolio was zero. However, under section 334(b)(2), the basis of the right to service the loan portfolio in the hands of Mortgage Co. upon liquidation would be the adjusted basis of Service, Inc., stock with respect to which the liquidation distribution was made. The adjusted basis of the right to service the loan portfolio, conceded to have a useful life not in excess of 8 years, was $921,376.56 on liquidation of Service, Inc., and underscores plaintiffs’ refund claims (Counts IV and VI) which are based on depreciation of the adjusted basis of the right to service the loan portfolio.

 The Commissioner of Internal Revenue allowed plaintiffs a charitable contribution deduction on exchange of the Promissory Note for the eight shares of stock, treating said Note as a valid gift to the Academy, but'concluded that the Note had a fair market value on May 20, 1965, of only $41,280 and so limited the allowable deduction. At trial, defendant established that the Note had a fair market value of $60,000 on May 20, 1965. The fact that the Note was paid off in full some 17 months later was not considered in the above determinations. In view of the holding herein that DeWitt made a valid gift of stock having a fair market value of at least $206,400 to the Academy, it is not necessary to reach any conclusion on these matters. Under applicable regulations, if a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the donated property. See 26 CFR 1.170-1 (c) (1) (Rev. as of Jan. 1, 1966).

 Defendant attempts to make much of DeWitt’s candid uncertainty that, if the policies of the Academy were such as to preclude any effort on his part to repurchase the stock, he doesn’t know whether he would have made the gift of stock to the Academy. This pre-delivery speculation adds little to resolution of the matter at hand. DeWitt realized some risk existed, once *291 he donated the stock to the Academy, that he might not be able to repurchase the stock from the Academy. He acknowledged that the risk was small since there was little, If any, market for the stock. However, even If the Academy sold the stock to another party, DeWitt would have sought to repurchase It from that party since the stock was worth more to him than anybody else. The Important fact is that after delivery of the stock, DeWitt no longer had dominion and control over the stock. The presence of this risk factor supports the view that a bona fide gift of stock was given. See Sheppard v. United States, supra, 176 Ct. Cl. at 253-56, 361 F. 2d at 977-78; Apt v. Birmingham, 89 F. Supp. 361, 392 (N.D. Iowa, 1950). The fact that DeWitt and the Academy may have expected and anticipated that the shares would be repurchased by Mortgage Co. does not Invalidate the gift made. Robert L. Fox, supra, CCH 27 Tax Ct. Mem. at 1013.

 In Humacid Co. 42 T.C. 894 (1964) a donor gave three promissory notes executed by a corporation controlled by the donor to several charities. Eleven days later the corporation offered to redeem the Notes at 80 percent of their face value and said offer was accepted by the charities. The fact that the Notes were redeemed at less than face value under circumstances of a common Identity of donor and corporation did not detract from the validity of the original gift.

 Nor example, In the Behrend ease two brothers donated shares of preferred stock In their controlled corporation to their family-owned charitable foundation. It was contemplated before the gift of stock was given that the corporation would redeem the stock as a means of funding the foundation. Thereafter, the corporation redeemed the stock in accordance with the contemplated plans. Neither the tentative planning of the donors, of which the donee was fully aware, nor the common identity of the donors, the corporation and the foundation was sufficient to impugn the bona fides of the gift of stock. Similarly, in the Carrington case, a donor gave more than 50 percent of stock in his wholly-owned corporation to a church In accordance with tentative plans which would enable the church to obtain a residence, owned by the corporation, which would be used as a rectory. A week or so later, in furtherance of the contemplated arrangement the corporation redeemed the stock from the church in exchange for the residence. The tentative planning underscoring the gift of stock and implementation of said plan a week or so later was not viewed by the Tax Court or, on appeal, by the Fifth Circuit Court of Appeals as invalidating the initial gift of stock to the church.

 The sentence in Agnew’s Memorandum read “* * * I felt that the wishes of the donor would be adhered to strictly and that the Trustees and the writer have always felt a high moral obligation with regard to the terms of any gift or donation * * Both Moran and Agnew stated categorically that this sentence had nothing to do with the disclosure of the tentative plans of the donor. Both related that the sentence was addressed to any wish that the donor might have in utilization of the money generated by the gift, e.g., a scholarship program, a building program, etc.

 Awareness of tie “wishes” of the donor and a respectful regard therefor Is not in and of Itself sufficient to invalidate a gift. See Sheppard v. United States, supra, 176 Ct. Cl. at 255, 361 F. 2d at 978.

 See Eliasberg, Will IRS’ attach on gift-and-repurchase contributions succeed, 28 The Journal of Taxation 366 (June 1968).

 In addition to the cases heretofore cited, see also Granite Trust Co. V. United States, 238 P. 2d 670 (1st Cir. 1956) ; Charleston Nat’l. Bank v. United States, 323 F. Supp. 530 (S.D. W. Va. 1971) ; Winton v. Kelm, 122 F. Supp. 649 (D. Minn. 1954).