**BASIC INCORPORATED, a corporation**

v.

**The UNITED STATES.**

No. 55–72.

United States Court of Claims.

Jan. 26, 1977.

Henry C. Harvey, Cleveland, Ohio, attorney of record, for plaintiff; Jones, Day, Reavis & Pogue, Cleveland, Ohio, of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, Washington, D. C., for defendant; Donald H. Olson and William Kalish, Washington, D. C., of counsel.

Before SKELTON, NICHOLS and KUNZIG, Judges.

OPINION

PER CURIAM:

This case comes before the court on plaintiff and defendant's exceptions to the recommended decision of Trial Judge John P. Wiese, filed December 15, 1975, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as modified, it hereby affirms and adopts the same as the basis for its decision in this case.* It is therefore concluded that plaintiff is not entitled to recover and the petition is dismissed.

---

* The dissenting opinion of NICHOLS, Judge, follows the opinion of the trial judge which has been adopted by the court.

## OPINION OF TRIAL JUDGE

WIESE, Trial Judge:

On November 24, 1964, a wholly owned subsidiary distributed to its parent corporation, plaintiff here, ownership of all the outstanding stock that it held in plaintiff's second-tier subsidiary. Immediately after this transfer, plaintiff sold the stock of both subsidiaries to an unrelated third party pursuant to a then-outstanding offer to purchase. The question that is raised in the case is whether the transfer of stock to plaintiff should be treated as an intercorporate dividend, a characterization which would here allow for an essentially tax-free transfer of basis to Basic, or, following the Government's position, is a transfer to be ignored for tax purposes, thereby yielding an increase in the capital gain which plaintiff realized from its sale of the stock of the two companies. The conclusion reached is that, for tax purposes, the dividend is to be disregarded and that plaintiff's gain on the sale should be increased by the corresponding amount.

### I. Facts **

A. Plaintiff, Basic Incorporated (hereinafter Basic), is an Ohio corporation whose principal business involves the production and sale of basic refractory materials for use largely in steel-making furnaces. In May of 1963, Falls Industries Incorporated (hereinafter Falls), became a wholly owned subsidiary of Basic through a merger carried out by an exchange of Basic's cumulative convertible preference shares for the outstanding shares of Falls. At the time of this acquisition, Falls was engaged in the manufacture and sale of processing equipment made wholly or in part from impervious graphite and certain specialized carbon and graphite formulations. This business was conducted at two plants, one located in Solon, Ohio; the other in Sanborn, New York.

On January 1, 1964, Falls transferred its Sanborn plant and related assets, having an adjusted basis of $501,869.75, to a then newly organized New York corporation called Basic Carbon Corporation (hereinafter Carbon). In return for this transfer of assets, Falls received all the stock of Carbon. Thus, as of January 1, 1964, Basic owned all the outstanding stock of Falls and Falls, in turn, owned all of the outstanding stock of Carbon. This configuration, expressed in more traditional terms, identified Basic as the parent corporation, Falls as the first-tier subsidiary, and Carbon as the second-tier subsidiary.

In August 1964, discussions were initiated between Basic and The Carborundum Company of Niagara Falls, New York (hereinafter also Carborundum), concerning possible business transactions between the two companies. Initially, these discussions focused only upon a merger between the two companies. However, by early October 1964, the discussions had also come to include the possibility of a partnership between Basic and Carborundum that would jointly expand the carbon and graphite business of Falls and Carbon as well as the possibility of a sale of this business to Carborundum. By the end of October, Basic had decided against the merger route and it had also come to realize that it could not afford the simultaneous capital outlays that would be required for the continuous development of its basic refractory business on the one hand and the costs involved in going forward with the intended expansion of the carbon and graphite business on the other. Accordingly, sale of the carbon and graphite business became the choice that Basic determined it would follow.

Subsequently, on November 6, 1964, at a meeting of the corporate officers of Basic and Carborundum, a purchase price for the carbon and graphite business was tentatively agreed upon between the respective board chairmen of the two companies. The price was tentatively set at $3,935,000 plus an assurance from the buyer, Carborundum,

---

** The facts that are noted at this point repeat, for the most part, the separate Findings of Fact which accompany the opinion.

guaranteeing the repayment to Basic of $1,000,000 which that company had previously advanced to Carbon. However, as to the details of the transaction, including the form in which it would be carried out, these were left for later negotiation.

In the course of the further negotiations that followed, Carborundum first proposed that it purchase all the assets of Falls and Carbon. To this Basic responded that the tentative price would have to be increased by $265,000 in order to allow for various tax and management considerations. Additionally, Basic demanded that Carborundum also agree to indemnify Basic for any further tax assessments that might become payable on the transaction in excess of those which Basic could anticipate and compute in advance. These considerations were unacceptable to Carborundum.

Inasmuch as Carborundum was chiefly interested in acquiring the assets of Falls and Carbon, it next proposed that it purchase from Basic, directly, the Falls stock and the Carbon stock. Its purpose in making this second proposal was to enable it to buy the stock of both companies for cash, to thereafter liquidate the companies so as to thereby acquire their assets and then to allocate the aggregate purchase price to the respective assets.

This second proposal was made by Carborundum because it was seen by that company to be in its own best interests; the proposal was not made by that company for the purpose of specifically granting Basic any tax advantages that might not otherwise result were the transaction to be cast in a different form. In a report to the board of directors of Carborundum, dated November 17, 1964, it was explained that, while Carborundum would have preferred to purchase assets only, it remained advantageous for Carborundum to purchase the stock of Falls and the stock of Carbon directly from Basic and that Basic would,

therefore, be requested to transfer the ownership of Carbon from Falls to Basic prior to the transaction.

Basic, for its part, considered the tax consequences of the proposed transaction as well as the alternative approaches that might be taken. It found the second proposal to be satisfactory.

On November 23, 1964, Carborundum submitted a formal offer to Basic conforming with the terms previously discussed. Thus, the offer proposed to: (a) purchase from Basic all the stock of Falls and all the stock of Carbon for $3,935,000; (b) buy, or cause to be paid, the $1,000,000 debt of Carbon to Basic; (c) reimburse Basic up to $100,000 for advances to be made to Falls and Carbon between October 31, 1964, and the transaction closing date; and (d) purchase at Basic's cost all its rights to acquire certain properties then being acquired by Basic. This offer provided for a closing date of December 31, 1964, or such other date as might be agreed upon. The offer was irrevocable, by its own terms, until November 27, 1964.

On November 24, 1964, one day after Carborundum had made its formal offer to Basic, a special meeting of the board of directors of Falls was held. At this meeting, which was attended by a quorum of Falls' directors, it was reported that the company's sole shareholder, Basic, had been discussing with The Carborundum Company the sale to Carborundum of the shares of Falls' wholly owned subsidiary, Carbon. It was also reported that Carborundum was insisting that it purchase these shares from Basic rather than from Falls directly. Accordingly, at this same meeting, the chairman of the board of Basic, who, as it happened was also a director of Falls,[1] recommended that Falls distribute the stock of its wholly owned subsidiary, Carbon, to Basic as a dividend so as to enable Basic to there-

---

1. The meeting was attended by three of Falls' directors. Of these three, two—a Mr. Eells and a Mr. Ludwig—held positions of comparable responsibility in Basic. Mr. Eells was chairman of the board of Basic and it was he who, together with his counterpart in Carborundum, had established the tentative purchase price; Mr. Ludwig was the financial vice-president of Basic and it was he who had participated in the followup negotiations that led eventually to the second Carborundum offer.

by deal separately with the stock of Carbon and the stock of Falls. After discussion, a resolution to such effect was passed and the stock of Carbon was transferred to Basic the same day. By means of this unilateral transfer, Basic became the legal owner of record of all the outstanding shares of Carbon stock.[2]

One day later, November 25, 1964, the board of directors of Basic authorized the acceptance of the terms and conditions specified in Carborundum's formal offer and the offer was so accepted on the same day. On December 29, 1964, the sale and transfer of all the stock of Falls and Carbon by Basic to Carborundum was completed in accordance with the terms of the agreement.[3]

B. In its federal income tax return for calendar year 1964, Basic reported dividend income from Falls in the amount of $501,-869.76 as a result of its receipt of the stock of Carbon. Also, it claimed a dividends-received deduction with respect to 85 percent of this amount pursuant to Section 243(a)(1) of the Internal Revenue Code of 1954[4] and it reported a long-term capital gain of $2,310,217.52 from the sale to Carborundum of the shares of Falls and Carbon. The amount of tax shown due in the return was timely paid by Basic.

During 1970, the IRS concluded an examination of Basic's federal income tax return for 1964 and determined that the reported gain from the sale of the shares of Falls and Carbon should be increased by $501,-869.76 and that the reported dividend income should be reduced by the corresponding amount. As a result of this determination, and other adjustments to Basic's return for 1964 which are not in controversy, additional income tax of $68,818.12, plus interest, was assessed against Basic. This additional amount has been paid. On November 3, 1970, after the execution of appropriate agreements extending the limitations period for assessment of Basic's income taxes for 1964, Basic filed a claim for refund of $87,827.22 on the ground that its treatment of the Carbon stock as a dividend was correct. On August 11, 1971, the refund claim was disallowed and on February 14, 1972, the present action was brought.

## II. *Discussion*

In matters of taxation, the point is often made that it is the substance of a transaction that determines its tax consequences rather than the form or timing with which it has been carried out. This doctrine or rule is a corollary of the fundamental principle of statutory construction that a transaction or event, even though falling within the literal terms of a statute, may yet be outside its spirit or purpose and thus be outside its intended scope.

The "substance-over-form" doctrine is commonly attributed to the decision in *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), a case in which the absence of a business purpose made literal compliance with the statutory provisions for a spin-off reorganization insufficient to accomplish what would otherwise have qualified as a tax free transfer. The taxpayer in *Gregory* had caused her wholly owned corporation to transfer certain property (shares of another corporation) to a newly formed corporation which the taxpayer also owned. Shortly after this transfer, the new

---

2. Aside from this stock transfer, the only other dividend distribution made by Falls during the period of Basic's ownership was a cash dividend of $275,000 that Falls had declared on November 5, 1964. The purpose of this November 5th dividend, which had been made payable on December 31, 1964, was to reimburse Basic for the cash dividends that it had paid and would continue to pay through December 1964 on the convertible preferred stock that it had issued at the time of its merger with Falls in May 1963.

3. The initial purchase price of $3,935,000 was adjusted downward by $25,000 in compromise of an accounting issue that developed following the offer-specified examination of the books and records of Falls and Carbon. This matter is immaterial to the issue presented in this case.

4. Other references in this opinion to code sections shall be understood to refer to the Internal Revenue Code of 1954, as amended, and in force during 1964, the tax year involved in this suit.

corporation was liquidated and its property was distributed to the taxpayer. Immediately thereafter, the taxpayer sold the shares that had been distributed in the liquidation. The only tax that was reported in this transaction was the capital gain realized on the sale after distribution. The Government challenged this tax treatment claiming that, in actuality, the intermediate transfer of the shares between the two corporations was not, as the taxpayer contended, a tax-free reorganization, but simply a means used to accomplish the distribution of a dividend.

In its decision, the Court acknowledged that a valid corporate entity had been created and that the transaction fit within the literal requirements of the statute. Nevertheless, in upholding the Government's position it went on to say that:

> When subdivision (B) [of Section 112 of the Revenue Act of 1928] speaks of a transfer of assets by one corporation to another, it means a transfer made "in pursuance of a plan of reorganization" * * * of corporate business; and not a transfer of assets by one corporation to another in pursuance of a plan having no relation to the business of either, as plainly is the case here. [*Gregory v. Helvering, supra,* 293 U.S. at 469, 55 S.Ct. at 267.]

The Court saw the facts before it as "[s]imply an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization * * * not to reorganize a business or any part of a business, but to transfer a parcel of corporate shares to the petitioner." (293 U.S. at 469, 55 S.Ct. at 267.) Such a situation, held the Court, "lies outside the plain intent of the statute." (293 U.S. at 470, 55 S.Ct. at 268.)

Although *Gregory* was concerned with a corporate reorganization question, the rationale of that case has not been confined in application to such situations alone. Rather, that decision, as Judge Learned Hand

explained in *Commissioner v. Transport Trading & Terminal Corp.*, 176 F.2d 570, 572 (2d Cir. 1949), has come to stand for the proposition "that in construing words of a tax statute which describe commercial or industrial transactions we are to understand them to refer to transactions entered upon for commercial or industrial purposes and not to include transactions entered upon for no other motive but to escape taxation." An even more incisive formulation of the same thought was later expressed—again by Judge Hand—in *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (dissenting opinion), in these words:

> * * * The Income Tax Act imposes liabilities upon taxpayers based upon their financial transactions, and it is of course true that the payment of the tax is itself a financial transaction. *If, however, the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it*; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose [emphasis added].

With the foregoing in mind,[5] we come then to consider the case at hand. That the stock distribution in issue fit the literal requirements of a dividend is not a point of debate—the transfer of the Carbon shares from Falls to Basic clearly met the specifications of Section 316(a)(1) which defines the term "dividend" as "any distribution of property made by a corporation to its shareholders out of its earnings and profits accumulated after February 28, 1913." Rather, the point of concern here is the tax implications that follow from the dividend characterization. Not only would this provide Basic with the advantage of a transferred basis in the Carbon stock (*i.e.,* the same basis which Falls held in that stock—Section 301(d)(3)), but, more importantly, Basic would obtain this transferred basis essentially tax free by virtue of the deduction

---

5. The *Gilbert* formulation quoted in the text above was later adopted by the Supreme Court in *Knetsch v. United States,* 364 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

from income allowed inter-corporate dividends under Section 243(a)(1). In net effect, then, the "cost-free" basis in the transferred stock would go to reduce the total gain realized by Basic in its subsequent disposition of that stock.

From the Government's point of view, the transaction fits the classic example of "a deal too good to be true." It argues that for tax purposes there was really no dividend at all. Instead, the court is urged to ignore the form of the transaction and to view the stock distribution simply as an integral step in a transaction in which Falls and Carbon were sold to Carborundum. By that reasoning, it is asked that we consider the value of the transferred basis to be part of the gain realized by Basic on its sale of the two stocks.

Basic stresses the fact that the stock transfer was necessary in order to put Basic, the seller, in the position of being able to meet Carborundum's requirement that it (Carborundum) purchase the shares of both subsidiaries directly from the parent company. Thus, the point Basic would make is that there was a valid business purpose for the move and, at the same time, the negation of any tax-inspired self-dealing.

This argument cannot be accepted. To begin with, it provides a less-than-complete explanation to say that the transaction took the form it did simply because that was the way Carborundum had wanted it. In actuality, if Carborundum's demands had alone controlled the shape of the transaction then the purchase would have involved an acquisition of the assets of the two companies rather than their stock. The fact is, however, that Carborundum's preferred approach was not undertaken simply because there were tax considerations attendant to the transfer in that form which had prompted Basic to demand off-setting increases in price. In turn, these price increases were unacceptable to Carborundum. Against this background then, the inference is readily drawn that Carborundum's second offer, in which it changed the form of the transaction but not the price, was accepta-

ble to Basic for precisely the same reasons that the first was not, namely, tax considerations. It would therefore be unrealistic to assume that Basic's own interests were any less served by the form of the transaction as finally carried out than the interests of Carborundum. Accordingly, to say that the stock transfer was necessary to meet the terms of Carborundum's second offer is no more than half a story.

Nevertheless, the fact that Basic may have been persuaded to go along with Carborundum's offer because of its favorable tax implications would not diminish the value of its argument insofar as that argument is offered to explain the immediate transfer between Basic and Carborundum. That transaction clearly had a business purpose, namely, to effect the sale and purchase of a business; hence, tax minimization considerations would be irrelevant.

However, it is quite another matter to offer that same argument in explanation and justification for the stock transfer that took place between Basic and Falls. The business interests of Falls were distinct from those of its shareholder, Basic. Hence, it will not do to invoke an explanation that has validity only as to Basic, *i.e.*, that the transfer was necessary because Carborundum had wanted it that way. Indeed, if such an explanation were sufficient then all manner of intermediate transfers could lay claim to "business purpose" simply by showing some factual connection, no matter how remote, to an otherwise legitimate transaction existing at the end of the line.

This then brings us to the second part of Basic's argument—the claim, as Basic puts it, that the "distribution * * * had independent significance." Under this heading, Basic points out that the distribution occurred before Basic's board of directors had approved the sale to Carborundum and also before any agreement existed with Carborundum. Additionally, with respect to post-agreement contingencies, Basic stresses that consummation of the sale was subject to a number of conditions including

audit verification of financial statements and the buyer's option to avoid the contract in the event of a material change in the financial condition of the two subsidiaries or for such other significant risk considerations as major lawsuits or material fire damage. These points, says Basic, represented real possibilities, any one of which might have thwarted finalization of the sale while still leaving Basic in possession of the stock of Carbon and hence, the recipient of a dividend.

These points are all unpersuasive. First, with respect to the argument regarding the timing of the stock distribution, that is, that the distribution had occurred before Basic had approved the sale and before there had existed an agreement with Carborundum, this argument presents a point more illusory than real. The stock transfer did not occur until *after* the receipt of Carborundum's formal offer on November 23, 1964. Much more important than that even is the fact that Carborundum's formal offer was irrevocable by its own terms until November 27, 1964—a circumstance which thus assured Basic and Falls that they could proceed with the stock transfer in the certain knowledge that all elements necessary to finalization of the transaction were in Basic's control alone. This was precisely the way the several steps were carried out: the formal offer was given on November 23, 1964, the transfer of stock was voted upon and carried out on November 24, 1964, and the offer was accepted by Basic on November 25, 1964. Furthermore, the same individuals who had been responsible for setting up the sale between Basic and Carborundum were likewise the individuals responsible for effectuating the transfer of the Carbon stock from Falls to Basic. Given these circumstances, it is an empty point to say that the stock transfer had independent significance because it preceded in time Basic's approval of the sale and the existence of a binding agreement with Carborundum. That was purely a happenstance; the whole transaction was a foregone conclusion that might just as well have been carried out in reverse order without changing the attendant risks or final result to the slightest degree.

With respect to the post-acceptance factors that plaintiff also offers in proof of the stock transfer's independent significance, these too contribute little to the point for which they are offered. *In toto,* they represent nothing more than the sort of risk factors that normally remain with a seller after contract execution but before final delivery.

These facts leave no room for a conclusion that a business interest was served by the claimed dividend. From all that appears, the case is plain that Falls, through its controlling parent, was caused to transfer the property whose sale the parent had decided upon for its own separate purposes. Nothing therefore remains save the obvious: the transaction reduced the tax that Basic would otherwise have incurred in the sale of its own property, *i. e.,* the shares of Falls.

Nor would it change the result to impute to Falls a purpose separate from that which had been imposed upon it. For even if that had been the case, still no more could then be said save that Falls itself had consented to the sale of its property and to that end had transferred the subject of the sale (the shares of Carbon) to Basic to enable it to carry out the transaction. And so viewed, the transaction fits squarely within the rule laid down in *Commissioner v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 567 (1945), wherein it was held that the gain from a sale which had been embarked upon by the corporation could not be avoided by an abrupt liquidation which left the shareholders to then carry on with the transaction which the corporation had started. As the Court there explained it, "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. * * * To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of

Congress." (324 U.S. at 334, 65 S.Ct. at 708 (footnote citations omitted).)[6]

Basic cites a number of decisions which it claims are support for a contrary conclusion. Among these is this court's decision in *Dynamics Corp. of America v. United States*, 449 F.2d 402, 196 Ct.Cl. 282 (1971). That case, like this one, involved a distribution in kind (corporate real estate) from subsidiary to parent followed by the parent's later sale of the distributed property. The issue, as here, was whether the transfer was legitimately treated as a dividend.

In sustaining the taxpayer's position in that case, two points were stressed: first, the absence of any evidence suggesting that, at the time of transfer, either corporation, parent or subsidiary, was aware of the possibility that the property would be sold 9 months later; second, it was judged that, as a holding company, the distributee parent was in a better position than its manufacturing company subsidiary to sell or to manage the property in question.

The difference between *Dynamics* and the instant situation needs little elaboration. The transfer there was explainable on valid business grounds, a conclusion reinforced by the lack of any sale commitment at the time of transfer as well as by the time lapse involved between the subsidiary's initial transfer of the property and the parent's sale thereof 9 months later. In short, the initial transfer was sustainable as a dividend because distribution by the subsidiary and sale by the parent were seen an unconnected events.

Similarly distinguishable are our decisions in *Sheppard v. United States*, 361 F.2d 972, 176 Ct.Cl. 244 (1966), and *DeWitt v. United States*, 204 Ct.Cl. 274 (1974), which plaintiff also cites. Both of these cases involved a donation-in-kind of appreciated property which was thereafter reacquired through purchase from the donee by a cor-

poration controlled by the taxpayer. The transaction offered tax advantages at both ends: the initial transfer provided the taxpayer with a charitable deduction; the reacquisition provided the purchasing corporation with a stepped-up basis. In neither case would the donation have been made had there not existed a realistic opportunity for its recovery by purchase from the donee.

Because reacquisition of the property represented a dominant concern in the taxpayer's choice of donees, the Government, in each case, sought to avoid the tax consequences connected with the gift. Thus, in *Sheppard* it argued against the initial transfer (the taxpayer's gift to the charity) by claiming that, in terms of end result, the entire transaction actually amounted to a sale by the taxpayer to his controlled corporation; in *DeWitt* it argued on more straightforward grounds contending simply that the taxpayer's gift had only been a conditional one. Common to both arguments was the thought that the donation to the charity was simply an intermediate step that served no legitimate business function but was only a move designed to generate favorable tax results.

The Government's arguments did not prevail. In each case the decisive point was that the gifts were bona fide transactions, that is to say, the taxpayer was found to have had the requisite donative intent and had accomplished a complete divestiture of the property. The donee, in other words, had received the property with "no strings attached." Therefore, under these circumstances, it mattered little that tax minimization was also part of the taxpayer's objective or that the gift was only a step towards a different final end. Having departed with all incidents of ownership the transaction was complete unto itself and in seeking to reacquire the property the taxpayer's controlled corporation had to deal

---

**6.** The *Court Holding* analysis would not alter either the posture or the correctness of the Government's assessment against Basic since, under that analysis, any gain that could be imputed to Falls through its sale of the shares of Carbon would in any event be realized by

Basic, and in the same amount, upon its sale of the shares of Falls. In short, the same gain reaches Basic's treasury absent, however, the off-setting advantage of the tax-free transferred basis which the purported dividend would have allowed.

with the donee as might any other third party. This meant that reacquisition of the property was an expectation and not a certainty. In this situation the gift stood the test of independent transaction for one could readily say that the donation affected the taxpayer's beneficial interests for reasons apart from the possibility of the property's later reacquisition.

Between this case and *Sheppard* and *DeWitt*, there exists this essential difference: here no reason has been given for the stock transfer save that it played a part in the whole, whereas in the gift cases, the transfer, at the time it was made, served a purpose unrelated to the transaction of which it became a part. The difference between the two is the difference between dependent and independent transfers.

The final case that requires mention is *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 518 (1950). There assets which had been received as part of a liquidating dividend (a tax-free distribution) were sold by the receiving shareholders pursuant to a plan which they, as individuals, had collectively determined upon while the corporation was still in existence. It was the Government's contention that the sale was actually a sale by the corporation and that it therefore owed a capital gains tax on the transaction. The argument was rejected. It had been found as a fact by the court below that at no time had the corporation itself planned to make the sale. Thus, in a tightly drawn holding, the Court said: "Whatever the motive and however relevant it may be in determining whether the transaction was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes." (338 U.S. at 455, 70 S.Ct. at 282.)

The point which plaintiff draws from the *Cumberland* case is the contention that taxes are to be assessed according to what actually happened and not according to a fictitious restructuring of events which maximize the revenue based upon a hypothetical situation. Since the bona fides of the corporate liquidation and shareholder sale were honored as independent transactions in that case, so, likewise, it is claimed, should the distribution followed-by-sale arrangement that took place here.

On the surface the argument has appeal but its problem is that it builds upon too loose a reading of the *Cumberland* decision. That case stands essentially for the rule of corporate recognition, that is, that a corporation, though closely held, yet remains a legal creature separate and apart from its shareholders. Once that fact is grasped then the result that it reached was predictable: having never itself determined to sell the corporate assets, and having undergone a genuine liquidation, the corporation could not then be charged with the gain later realized on a sale of assets it never made.

Here, of course, no question has been raised regarding the separate identities between Falls, the corporation, and Basic, its shareholder. But the similarities between this case and *Cumberland* go no further than that. The point of departure is to be found in the fact that the property transfer in *Cumberland* was undertaken as an end unto itself. The same was true of the transfers in *Sheppard* and *DeWitt*. In all these cases the object of the transfer was to accomplish a change in legal status between the taxpayer and his property *for reasons independent of the later disposition of that property at the hands of the recipient.* That is clearly not the situation here. In *Cumberland* there was a purpose to liquidate; in *Sheppard* and *DeWitt* there was a purpose to make a gift. It happened only that, in these situations, the tax laws made it possible to combine that objective with still another or, roughly said, "to kill two birds with one stone." Yet that sort of situation is precisely what the law does allow for, as Judge Hand put it in *Gilbert v. Commissioner, supra*:

    * * * When a taxpayer supposes that the transaction, in addition to its effect on his tax, will promote his beneficial interests in the venture, he will of course secure the desired reduction, for it would be absurd to hold that he must

deny himself an economic advantage unless he pay the tax based upon the facts that have ceased to exist. [248 F.2d at 411.]

Under the facts and circumstances presented here, plaintiff has not shown that there was a reason for the transfer of the Carbon stock from Falls to Basic aside from the tax consequences attributable to that move. Accordingly, for purposes of taxation, the transfer was not a dividend within the meaning of Section 316(a)(1). Instead, it should be regarded as a transfer that avoided part of the gain to be expected from the sale of the business to Carborundum, and should, therefore, be now taxed accordingly. Such a treatment is in keeping with the results reached in like situations. *Steel Improvement & Forge Co. v. Commissioner,* 314 F.2d 96, 98 (6th Cir. 1963); *Commissioner v. Transport Trading & Terminal Corp., supra.*[7]

The Government's tax assessment having been correct in principle and in amount, it follows that plaintiff is not entitled to any recovery.[8]

NICHOLS, Judge, dissenting:

Respectfully I dissent because the evidence leads me to conclude that a good and sufficient non-tax purpose motivated the distribution of Carbon's stock from Falls to Basic. I would find that the form of the transaction amply reflected its substance, and hold that the tax treatment should follow from that. I would treat the distribution of Carbon's stock as a dividend paid by Falls to Basic, just as it purported to be.

First, as to the governing law. I will point out why I differ from the trial judge's opinion as I go along, but I agree with the trial judge that a useful place to begin analyzing this problem is with *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the watershed of the "substance-versus-form" doctrine of our tax law. The trial judge accurately summarizes the outcome in *Gregory*: a taxpayer was denied certain tax advantages because the Supreme Court found her claim to such treatment rested solely upon her literal, but not meaningful, compliance with the tax statute that conferred the benefit. Since its genesis in the context of corporate reorganizations, the doctrine of *Gregory* has enlisted such a following that an inquiry into whether the substance of a transaction corresponds to its form is now appropriate in every area of tax law. Accordingly, wherever there occurs a transaction so heavily laden with tax avoidance motives that it appears to be a sham, our courts are justified in disregarding the mere formalisms and recasting the transaction as its economic substance suggests. *See,* B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, # 14.51 at 14–99 (1971).

Of course, the *Gregory* doctrine is not without its limits; courts are not entitled to discard routinely the form given to taxpayers' affairs as if form were merely a dispensable wrapper surrounding a distinct substance within. "The solution of hard tax cases requires something more than the easy generalization that the substance rather than the form of a transaction is determinative of its tax effects, since in numerous situations the form by which a transaction is effected does influence or control its tax consequences." *Waterman S. S. Corp.*

---

**7.** A recent revenue ruling, Rev.Rul. 75–493, 1975 Int.Rev.Bull. No. 46, at 8, found a dividend in the situation where a corporation's cash distribution to its noncorporate shareholder took place immediately prior to the shareholder's sale of the corporation to a third party. That result is distinguishable from the present case in that the property there transferred (*i. e.,* the cash), while it affected the purchase price, was not itself the intended subject of any later sale at the hands of the recipient. Aside from noting this distinction, we intend no judgment

here as to the correctness of the cited ruling. For an apparent contrary ruling, however, *see Steel Improvement & Forge Co. v. Commissioner,* 314 F.2d 96 (6th Cir. 1963).

**8.** In the conclusion to its brief, the Government asked that "costs" be assessed against the taxpayer. The costs sought were neither identified by category nor by amount and, absent any specificity with respect to what the requested assessment is meant to entail, it cannot be considered.

*v. Commissioner*, 430 F.2d 1185, 1192 (5th Cir. 1970); *United States v. General Geophysical Co.*, 296 F.2d 86, 87 (5th Cir. 1961). The courts are not licensed to distort the law, to write in new provisions, or to render present provisions nullities; the doctrine is reserved to enable the courts to "guard against giving force 'to a purported transfer [that] gives off an unmistakeably hollow sound when it is tapped.'" 430 F.2d at 1197; 296 F.2d at 89. Thus *Gregory* is multidimensional. I agree with the trial judge that Judge Learned Hand was—in *Gilbert v. Commissioner*, 248 F.2d 399 (2d Cir. 1957)—among the most successful in distilling *Gregory's* meaning to an aphorism, but I prefer to rely on somewhat more of Judge Hand's language than the trial judge quoted:

> * * * If * * * the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; * * * When a taxpayer supposes that the transaction, in addition to its effect on his tax, will promote his beneficial interests in the venture, he will of course secure the desired [tax] reduction, for it would be absurd to hold that he must deny himself an economic advantage unless he pay the tax based upon the facts that have ceased to exist. * * *

*Id.* at 411.

The touchstone, therefore, that distinguishes a transaction worthy of being recognized as it appears from one deserving to be disregarded is the presence of a "good business purpose" rather than the absence of any desire on the taxpayer's part to save taxes. The taxpayer's purpose to escape taxes is legally neutral. *Chisholm v. Commissioner*, 79 F.2d 14 (2d Cir. 1935). "There is nothing sinister in so arranging one's affairs as to keep taxes as low as possible. * * * [N]obody owes any public duty to pay more than the law demands: taxes are enforced exactions, not voluntary contributions." *Commissioner v. Newman*, 159 F.2d 848, 850–51 (2d Cir. 1947) (L. Hand, J., dissenting on other grounds). I would hold that Basic is entitled to favorable tax treatment if its method of selling its subsidiaries

furthered its business interests, even if Basic chose one means of accomplishing this over the alternatives because this one exposed it to the least tax.

Second, as to the facts. As I see our task, we now must examine the facts of record to determine whether the taxpayer acted in pursuit of a legitimate business purpose in selecting the form given the transaction, regardless of any motive to minimize its tax. I am convinced by the record that such a business purpose was present, while the majority, apparently, was not. We quarrel over the legal significance to be given the facts. I should pause here to point out that I do not contend that the trial judge's factual findings are erroneous, as far as they go, even though I find that they do not go far enough. This is a case comfortably within the scope of our duty to review the findings of our trial judges where necessary, even in the absence of suitable exceptions. *Miller v. United States*, 339 F.2d 661, 168 Ct.Cl. 498 (1964). In any event, plaintiff has excepted to the trial judge's Ultimate Finding (No. 37), which serves to bring the underlying factual questions properly before us.

Usually, it is the taxpayer's own business purpose that attracts the court's attention. Where the taxpayer establishes that it acted to further its own business, the question is resolved in the taxpayer's favor, and the transaction taxed as it appears. In an arm's length transaction the business purpose may also be that of the party other than the taxpayer, who insisted on it for his own business reasons. Here, the taxpayer relies for its business purpose on Carborundum's desires to structure the purchase of taxpayer's subsidiaries in a particular way, and the trial judge correctly desired to know whether Carborundum's position was itself supportable by legitimate business considerations. The trial judge's concern is well-taken, for this might have been an instance of collusion if, for example, the taxpayer sought to protect itself by putting the words of its defense in the mouth of another corporate taxpayer, which it controlled. If that kind of self-dealing were

found here, I would agree with the majority's result. Similarly, I would agree if self-dealing took another form, as in *Waterman S. S. Corp. v. Commissioner, supra,* where just before it was sold to another corporation, the taxpayer's subsidiary transferred cash to the taxpayer, as an obvious advance of the purchase price. There was no such evidence here, however, and none of the trial judge's findings suggest collusion. To the contrary, Finding 31 states that "Carborundum and Basic were unrelated parties that dealt with one another on an arm's length basis." And the trial judge further recognized that Carborundum acted in furtherance of its own interest in proposing the sale of stock by Basic and that Carborundum's proposal was not intended to confer tax advantages upon Basic. (Findings 14, 24.) These findings are probably inspired by the uncontradicted testimony of Carborundum's assistant treasurer, Mr. Lebold, who explained the considerations that motivated Carborundum's management to insist upon purchasing both Falls' and Carbon's stock directly from Basic.

In summary, Carborundum originally proposed to buy assets only leaving the corporate stock untouched. Basic rejected this except at a price Carborundum did not wish to pay, $265,000 above the price the executives had already agreed on in principle. This was because of unfavorable tax consequences that Basic anticipated from a sale of assets that included depreciated facilities, on which any gain over basis would be taxable as ordinary income, and also, no doubt, inventory. No one suggests that Basic should now have to pay the taxes such a sale would have generated. This left stock sales as the remaining options the parties could have. They might be as follows:

(A) Carborundum might buy the Falls stock from Basic, leaving the Carbon stock undisturbed in Falls' treasury. Carborundum objected to this because it could not have allocated part of the purchase price, over the book values, to make a new basis for Carbon's assets. Carbon in fact owned a substantial part of the assets Carborundum wished to acquire.

(B) Carborundum might buy the Carbon stock from Falls and then buy the Falls stock from Basic. Carborundum objected to this for both tax and non-tax reasons. The tax objection was that Falls would have realized a taxable gain which Carborundum, as its new owner, would have had to pay, even if indirectly. The non-tax reason was that Carborundum would have had no contractual recourse except against itself had the Carbon assets been found to be not as represented.

(C) Carborundum might buy the stock of each subsidiary from Basic. To make this possible, the Carbon stock had to be got from Falls' treasury into Basic's. No matter how accomplished, this would have appeared to be a dividend for tax law purposes, and under other circumstances, the IRS would probably have insisted it was a dividend even if called something else.

It would seem that, from Carborundum's point of view, option C had to be adopted because there existed fatal objections to A and B. It is not apparent what other options there could have been. It remains to inquire whether these considerations were actually in Carborundum's mind at the time or were afterthoughts. It is now time to look at Mr. Lebold's testimony in the record:

Plaintiff's counsel. What was the reason for your suggesting that Carborundum purchase the stock of Carbon from Basic?

Mr. Lebold. Well, the reason was that * * * there was a substantial premium we were paying over the book value or the tax basis of the assets [in] the respective companies. If we bought the shares for cash we could liquidate [both subsidiaries] under section 334(b)(2) [of the Internal Revenue Code] and write up the assets to their respective fair market values. [Transcript at 77–78.]

Plaintiff's counsel. Was it then your opinion that the price to be paid could not be satisfactorily allocated to the assets of the two companies if Carborundum sim-

ply purchased the stock of Falls from Basic?

Mr. Lebold. Yes, definitely. You have to purchase at least 80% of the shares of a company in order to meet the requirements of * * * section 334(b)(2).

Plaintiff's counsel. Were you desirous of purchasing the stock of Carbon so that you could attribute the price paid for that stock to the assets of Carbon?

Mr. Lebold. Yes, we were because the assets of Carbon contained some intangibles that were more valuable than assets held by Falls, so we wanted to purchase each company's shares. [Transcript at 78–79.]

On subsequent cross-examination, Mr. Lebold participated in this exchange:

Government's counsel. Why did you not consider * * * buying the Carbon shares from Falls and then buying the Falls shares from Basic?

Mr. Lebold. Well, that didn't seem to be the clean way to handle the transaction if we even gave it serious thought * * * it seems to me it would be quite awkward and not even feasible[. I]f we had bought the shares [of Carbon] from Falls, then Falls would have a gain. Then if we wanted to buy the shares of Falls from Basic, Inc., we would have to pay a bigger price because the profit on the sale of Carbon would be in Falls. [Transcript at 87.]

Mr. Lebold later elaborated on this "awkwardness" in response to the trial judge's request for clarification of Carborundum's position. Mr. Lebold replied:

* * * it seemed to me that if we had bought the shares [of Carbon from Falls] there probably would have been a gain that Falls would have had on the sale. Then we would have this profit in Falls. Let's see, if we bought the Falls shares from Basic, Inc., we would have to pay for the profit twice, wouldn't we? [Transcript at 106.]

I believe that Mr. Lebold was correct that Carborundum would have paid twice if the transaction were attempted in this manner.

If Carborundum had paid Falls the cash price for Carbon's stock, Falls and not Basic would have realized the profit. If Basic could not have reached that profit, it would reasonably expect that Carborundum, in the next step of the transaction, would pay for Falls stock an amount that represents the expected profit on both Falls' and Carbon's stocks. As Mr. Lebold anticipated, Carborundum would thus have paid twice for Carbon, first to Falls and then to Basic. And after Falls became a part of Carborundum's corporate organization, it must still pay a tax on the gain realized upon selling Carbon's stock. In the end, Carborundum would have transferred funds from one of its corporate pockets to another, serving no purpose but incurring a tax nevertheless. Awkward indeed! There might have been additional alternatives, but each would have injected an awkwardness of its own. Carborundum could have, for example, paid a lower price for Carbon stock and a higher price for Falls, but thereby it would sacrifice its ability to allocate its costs among Carbon's valuable assets, which was Carborundum's primary purpose from the outset. Similarly, if Carborundum purchased solely Falls' stock from Basic, it would not have been entitled to invoke section 334(b)(2) upon liquidating Carbon, because Carborundum would not have purchased 80% of the stock of Carbon as that section requires.

I would be satisfied with this much alone to find that the form chosen for the transaction served the interests of both Basic and Carbon, that there was a sufficient business purpose. But then, on recross-examination, Mr. Lebold proceeded to describe still another dimension to the "awkwardness" involved if Carborundum purchased Carbon stock from Falls:

Government's counsel. Could you describe for me what you mean by the term "awkward" in your response just before?

Mr. Lebold. Well, "awkward" from the standpoint that I just covered [the problem of having to duplicate the profit to Basic], and from the fact that we would be dealing with a company that we are going to turn right around and buy[.]

I would sooner deal with a third party and buy companies from them where I could have some recourse if something in the agreement was defective from our standpoint later. [Transcript at 106.]

\* \* \* [This] other consideration is the one in the contract itself. We would rather have an existing company that is on the New York Stock Exchange [as] the seller in case we do have some problems turn up later under the agreement. [Transcript at 107.]

Plaintiff's counsel. [I]s is correct \* \* \* that if you had purchased the stock in \* \* \* Carbon from Falls that would have involved a contractual obligation between you and Falls?

Mr. Lebold. Yes.

Plaintiff's counsel. Then if you had immediately thereafter purchased the stock of Falls from Basic your first contract relating to the purchase of the Carbon stock would have been between you and your own preaching?

Mr. Lebold. Yes.

Plaintiff's counsel. Which is not a very satisfactory situation if you need any recourse under the contract?

Mr. Lebold. That's right.

Plaintiff's counsel. So that the awkwardness did not, in fact, only relate to the tax considerations?

Mr. Lebold. That's right. [Transcript at 108.]

Little more need be said, in my view, to establish a sufficient business purpose—or, perhaps, several business purposes. I might even entertain the suggestion that the structure chosen by the parties may have been the only way to satisfy both sides of the deal. In any event, the record places this case beyond the scope of *Commissioner v. Transport Trading & Terminal Corp.,* 176 F.2d 570 (2d Cir. 1949), cited by the trial judge, which advises the courts to withhold tax benefits from "transactions entered upon for *no other motive* but to escape taxation." 176 F.2d at 572 (emphasis supplied).

The trial judge makes much of the fact that the taxpayer and Carborundum active-ly considered how the tax results would differ depending on how they chose to structure the transaction. It can be said bluntly, I think, without undermining their respective positions, that both Basic and Carborundum sought to consummate the deal at the smallest tax cost. This is no more than a taxpayer's legitimate desire to escape taxes, which is legally neutral so long as the form of the transaction is otherwise supported by the taxpayer's business interests. Since I cannot conclude, upon reviewing the record, that the stock distribution was "a mere device \* \* \* a disguise for concealing its real character" inveighed against in *Gregory v. Helvering, supra,* I would sustain the taxpayer's refund claim.