CHARLES W. ALLEN *vs.* PETER RAKES & another.

Worcester. February 5, 1971. — March 5, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, & BRAUCHER, JJ.

*Contract,* For sale of real estate, Consideration, Option. *Broker,* What constitutes relation. *Equity Jurisdiction,* Specific performance.

Evidence reported in a suit in equity required a conclusion that an agreement by the defendants giving the plaintiff an option to purchase their real estate for a stated price, to which was attached a rider reciting that price and "No Commission," was a true option, notwithstanding previous negotiations between the parties and the original draft of the rider which pointed to an arrangement whereby the defendants would pay the plaintiff a "brokerage" commission upon a sale of the premises at a higher price, and, where it appeared that in addition to a recital of a nominal consideration in the option agreement the plaintiff continually tried to negotiate a transaction out of which the defendants would receive the stated price without paying a commission, it was held that there was consideration for the option and that the plaintiff was entitled to specific performance of the option agreement, even though he had been paid for an option to sell the premises to a third person for a higher price and had not revealed that fact to the defendants.

BILL IN EQUITY filed in the Superior Court on March 18, 1969.

The suit was heard by *Meagher, J.*

*Charles F. Barrett (William H. Bentley* with him) for the plaintiff.

*Willard I. Shattuck (David M. Tower* with him) for the defendants.

CUTTER, J. Allen seeks specific performance of a written agreement relating to the proposed sale to him, by Rakes and his wife (the vendors), of land in Leominster (the locus). A Superior Court judge, upon evidence which is reported, made findings (adopted as a report of material facts) and entered a final decree (a) that the vendors pay $1,800 to Allen, and (b) that the bill be dismissed. Allen appealed.

The meager report of material facts states the circumstances essentially as follows. An option agreement was signed by the vendors on March 18, 1968. Prior to their execution of that agreement, an agreement had been signed by them on August 21, 1967, extended on December 20, 1967, and February 14, 1968. Before "the agreement dated August 21, 1967, was . . . signed, changes were made in the proposed agreement as mailed to" the vendors by Allen. These changes "took the form of reducing the price stated from [a] gross price of $120,000 to a new price of $113,000, and the corresponding reference in . . . [a] rider attached . . . was changed to reflect the change from a gross to a net price." [1]

The new agreement of March 18, 1968, "was the same . . . basically, as" that of August 21, 1967. Some time in the summer of 1968, Allen notified the vendors "that they should sign an application for a gasoline station permit and curb permit so that he could further the negotiations with oil companies to purchase the property . . . ." They "did this, and the curb permit and a permit for a gasoline station were issued . . . ." Allen "employed counsel and various experts in order that the permits might be obtained, and that the property might be surveyed." He "expended considerable time in making sure that the property was suitable

---

[1] The option agreement of March 18, 1968, had attached to it a Rider 2A, reading "Price is $113,000 — No Commission." Allen testified that this rider was first attached to the option agreement of August 21, 1967 (erroneously printed 1969 in the record) when it was signed, and was later transferred and attached to the new option agreement of March 18, 1968. As originally drafted, this Rider 2A read, "In the event the property is purchased and the sale completed, the first party . . . [the vendors] agrees to pay the second party [Allen] a brokerage commission of six per cent." The change in form was made at Rakes's insistence.

for a gasoline station." To this end he spent $1,800. "[I]t was understood at all times that . . . [the vendors were] to sell to some oil company and that upon the sale . . . [Allen] would receive compensation." Except for the somewhat ambiguous final sentence just quoted, the trial judge's findings, as far as they go, are justified by the evidence.[2]

The option agreements and extensions are before us as exhibits. Each agreement in pars. 1 and 2 reads, "1. OPTION. In consideration of . . . $1.00 . . . paid to First Party [the vendors] . . . First Party hereby grants to Second Party [Allen] the option to purchase, for . . . $113,000 . . . [the locus] . . . . 2. PERIOD. Second Party may exercise this option by giving First Party [a notice] (herein called 'the first notice') at any time within . . . 120 . . . days after the date hereof." Allen had been an employee of Shell Oil Company for thirty-two years engaged in acquiring real estate for service station development. Upon his retirement, he had engaged in real estate activities "specializing in service stations." In preparing these option agreements he used a form which he had used forty-five or fifty times for Shell Oil Company, substituting his name (for that of the company) as holder of the option.

There was evidence from which it could be found that in May or June, 1967, Allen, as a broker, procured from Rakes an oral listing of the locus for sale at $120,000, with a six per cent commission; that Allen wanted an option "as a means to tie up the property for . . . [him] as a broker." He sent two copies of the form of option agreement (eventually signed on August 21, 1967) to Rakes with a letter of July 14, 1967, asking Rakes to have his "attorney go over it with" him, fill in the date, and have it executed. Allen admitted on cross-examination that if the agreements had been signed in the form in which they were sent to Rakes, Allen "would have been . . . [the vendors'] agent to sell the property." Rakes, about August 21, 1967, got in touch

---

[2] If the final sentence merely means that it was expected that the locus would be purchased in some manner (e.g. by direct sale by the vendors or by resale by Allen) by an oil company, that finding also is justified.

with Allen and the agreements were signed changing the price to $113,000, striking out the provision for a commission, and modifying[3] the wording in Rider 2A. See fn. 1.

The evidence shows that the option agreement of March 18, 1968, ran through September 30, 1968. A first notice was to be given during the option period by registered letter but the notice was to "be deemed given when the letter . . . [was] deposited in the mail" duly addressed. Such a registered mail notice was deposited in the mail by Allen on September 30, and was received by the vendors on October 1, 1968. On November 1, 1968, the vendors (through an attorney) stated that they would not sell the locus to Allen. On December 9, 1968, Allen (through an attorney) gave the vendors registered mail notice of a date for closing. He testified that he was at the registry of deeds on the date and at the time stipulated but that Rakes did not appear.

On September 21, 1967, Allen received $100 for an option to sell the locus to an oil company for $125,000. He did not reveal this fact to Rakes. The evidence would permit a finding that Allen paid to the vendors in cash at most the stated one dollar consideration for each option, but that, it was expected, when each option and extension was signed, Allen would expend[4] and continue to expend substantial effort to dispose of the property in a manner which would realize net proceeds of $113,000 for the vendors without payment of a commission.

1. There is (a) an apparent inconsistency between the first form of Rider 2A and its final form (see fn. 1) and (b) also some inconsistency between the first form of Rider

---

[3] Allen testified that Rakes then told him "You have . . . to look to somebody else for your money," and that he (Allen) replied, "Now I will have to buy the property . . . find a customer and sell it at a higher price, in order to show any profit for myself." To this, Allen said, Rakes replied, "Well, you handle that yourself." Rakes's testimony was that there was no change in Rider 2A in August 1967, but his brief concedes that the change was then made.

[4] It may be significant that the extension of Feburary 14, 1968, referred to a deposit of $1,000 as to be made at the time of "Acceptance of Option" and that the extension of December 20, 1967, referred as consideration to "the work done by . . . [Allen] in connection with the sale of" the locus.

2A and the apparently absolute form of each option agreement (that of August 21, 1967, and March 18, 1968). Even if these ambiguities are sufficient (see *Allen* v. *Mut. Acceptance Corp.* 350 Mass. 553, 557–558; *Regina Grape Prod. Co.* v. *Supreme Wine Co. Inc.* 357 Mass. 631, 634) to permit extrinsic evidence concerning the circumstances in which these option agreements were made, we are of opinion that none of the reported evidence justifies the conclusion that the option agreement of March 18, 1968, was anything different from what it appears to be, viz. a true option with Allen as its holder.

We need not decide whether the agreement of August 21, 1967, would have been in effect a brokerage arrangement if Rider 2A, with its references to a commission, had remained in its original form. As changed, Rider 2A negated any commission arrangement and provided for an option price of $113,000 without any commission. The evidence of negotiations about the option agreement of August 21, 1967, between Allen and Rakes tends to confirm the literal meaning of the two option agreements, by showing that Allen was not to look to the vendors for a commission, but was free either to buy the locus and resell it or to obtain compensation from a purchaser to whom he had assigned the agreement.

2. There is ample indication of valuable consideration, not only in the nominal consideration recited in the option agreements but in the continuing efforts of Allen (with at least the vendors' acquiescence, if not at their request; see Restatement 2d: Contracts, [Tent. draft No. 2, Apr. 30, 1965] § 90) to negotiate a transaction out of which the vendors would receive $113,000 without paying a commission.[5]

3. Upon the reported evidence we perceive no fraud or overreaching by Allen which should lead to denying specific

---

[5] We do not consider whether in any event the option agreements were sealed instruments, although opposite each signature was the printed notation "(seal)." The vendors, in arguing that these were not sealed instruments rely on *Capitol Amusement Co.* v. *Gallagher*, 268 Mass. 321, 323, where in parentheses appeared the letters "(L. S.)" after each signature. That case, however, dealt with an instrument dated January 20, 1928, a year before the enactment of St. 1929, c. 377, § 2, inserting § 9A in G. L. c. 4. See Swaim, Crockers Notes on Common Forms (7th ed.) §§ 355–360, 967–968.

performance. Upon our interpretation of the agreement of March 18, 1968, as a true option, Allen was no longer acting as a broker for the vendors. He was not bound to report offers for the locus received by him, for his compensation could be obtained in any reasonable manner which would result in paying the vendors $113,000 free of any obligation to pay a commission. Specific performance of contracts to convey land is usually granted. *Raynor* v. *Russell*, 353 Mass. 366, 367. *Kaplan* v. *Bessette*, 357 Mass. 233, 235. There is shown no substantial or adequate equitable basis for the exercise of discretion to deny specific performance of this option contract. See *Tucker* v. *Connors*, 342 Mass. 376, 381–382. See also *Nichols* v. *Sanborn*, 320 Mass. 436, 438.

4. The final decree is reversed. The case is remanded to the Superior Court for further proceedings consistent with this opinion. Allen is to have costs of appeal.

*So ordered.*