**S. Prestley BLAKE and Setsu Blake, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 273, Docket 82–4098.**

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1982.

Decided Dec. 28, 1982.

Robert K. Gad, III, Ropes & Gray, Boston, Mass. (Harry K. Mansfield, of counsel), for appellants.

Stephen Gray, Atty., Dept. of Justice, Tax Div., Washington, D.C. (Glen L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Richard Farber, Attys., Dept. of Justice, Tax Division, Washington, D.C., of counsel), for appellee.

Before OAKES and WINTER, Circuit Judges, and MacMAHON,* District Judge.

OAKES, Circuit Judge:

This appeal presents a familiar problem in the tax law involving step-transaction analysis. The context is one in which a taxpayer "contributes" a substantially appreciated asset to a charitable organization which then liquidates the contribution and purchases another asset from the taxpayer. The question in this case is whether the taxpayer is entitled to treat the transfer of the first asset—corporate stock—as a contribution and treat the transfer of the second asset—a yacht—as a sale, or whether, as the Tax Court held,[1] the transactions here must be recharacterized for tax purposes as a sale of the stock by the taxpayer followed by a contribution to the charity of the vessel. The vessel, it might be noted, was sold by the charity shortly after it had been purchased from the taxpayer for a little less than half of what the charity paid the taxpayer out of the proceeds of the stock. The taxpayer contends that the charity had no legally binding obligation to purchase the yacht and that absent such an obligation the transactions here must be treated according to the form they took: a contribution followed by a sale of an asset. We disagree. We hold that in this case the charity would have been legally obligated to purchase the yacht and that, even if it were not legally obligated, the Tax Court's finding that the transactions were under-

* Of the Southern District of New York, sitting by designation.

1. *Blake v. Commissioner,* 42 T.C.M. (CCH) 1336 (1981).

taken pursuant to an understanding arrived at in advance is sufficient to sustain the Commissioner's position. We therefore affirm the Tax Court, Arnold Raum, Judge, in its decision that the gain realized on the sale of the stock was attributable to the taxpayer. It follows that only the market value of the yacht, not challenged on this appeal, was deductible as a contribution.

## I. *Facts*

The taxpayer in this case, S. Prestley Blake, was a co-founder and major stockholder in the Friendly Ice Cream Corporation. In 1972, Blake purchased the yacht "America" for $500,000.[2] The America is a replica of the original yacht America, built in 1851, after which the America's Cup race is named. Although not particularly well suited to racing or chartering, the yacht does have a certain mystique owing to its historical associations. Subsequent to the transactions recounted below, the America became familiar nationally because it was featured in the Tall Ships' Sail to New York City during the Bicentennial celebration of 1976. Blake, however, had nothing but trouble with the yacht. The vessel required frequent repair, and Blake found various captains and crews unsatisfactory. With one exception, Blake's ambition to defray expenses associated with owning the boat through chartering was never realized. He ultimately decided to dispose of the yacht; in his own words, he "had to get rid of [the America] at all costs," because it "was taking too much . . . time and concern."

Blake had made a number of charitable gifts throughout his career, particularly in western New England, his home and the place where he started business. He attempted to donate the America to Mystic Seaport in Mystic, Connecticut, but that institution declined the gift. More unhappy cruises followed. Some time later, Blake approached the Kings Point Fund, Inc. (the Fund), a qualified charitable organization[3] associated with the United States Merchant Marine Academy at Kings Point, New York. In January and February of 1975, Blake and the superintendent of the Academy discussed the possibility of the Academy's use of the America as a training vessel, and the Superintendent wrote Blake a letter in late February of 1975 confirming the Academy's interest in the proposition. The letter expressed gratitude for Blake's "extremely generous offer to donate" the America and to "provide an additional annual grant of $10,000 towards its maintenance." The record indicates that the Fund's directors had discussed the possibility of acquiring the America at an earlier meeting where it was suggested that the boat be kept for at least two years and that Blake donate $10,000 annually and that twelve other major donors be solicited to raise an additional $125,000 for upkeep. On March 13, 1975, some two weeks after the Superintendent wrote Blake, the Fund's directors met again. It was reported at the meeting that Blake was "very receptive to donating his YACHT AMERICA to the Kings Point Fund" and the minutes of the meeting indicate that "[f]urther negotiation packages to this acquisition [were] to be discussed." A motion to acquire the America, subject to the consent of the Superintendent and approval of legal counsel, carried the Board unanimously.

In the meanwhile, Blake was apparently consulting with his tax lawyers. Four days after the March 13 meeting, he wrote the Fund that he had transferred 35,000 shares of Friendly stock "to advance your training program for young cadets in a way that you see fit." The stock had an adjusted basis in Blake's hands of $98, but a market value of $686,875 at the time of transfer. The Fund immediately sold the stock in a series of transactions netting $701,688.89. At an April 8, 1975, meeting of the Fund's directors, it was reported that "Mr. Blake had

---

2. The purchase was formally concluded not by Blake as an individual, but by his wholly owned corporation, S.P. Blake, Inc., created for that purpose under Delaware law in 1972. Since the corporation and the America were subject to Blake's control, we, like the Tax Court and the parties, will treat the case as if there were no such corporation involved.

3. I.R.C. § 501(c)(3) (1976).

donated ... $714,000 ... worth of Friendly Ice Cream stock" to the Fund, that the Fund "then sold same," and that $675,000 "is to be used to purchase the yacht AMER-ICA and the remainder is to be used toward the maintenance of the vessel." The Board unanimously accepted "the generous donation of Mr. P. Blake to be used for the purchase of the yacht America and her maintenance." Almost immediately, however, the Board set out to sell the yacht; at a June 17, 1975, meeting a possible sale was discussed which would allow the Academy to use the vessel for the Bicentennial "Tall Ships Parade." This sale was approved, the minutes noting that it would "net the Fund over $200,000." Presumably this sale was carried out over the summer; the minutes of a meeting of September 18, 1975, show that, in addition to selling half a dozen other smaller craft, the Fund sold the America for $250,000, netting it some $200,-000. The taxpayer does not dispute that, but for his expectation that the Fund would purchase the vessel, he might not have contributed the stock. But he argues that he had, at most, an expectation in this regard because there was no binding, enforceable commitment on the Fund's part to purchase the vessel. He points out that the directors of the Fund were free not to purchase the yacht if they determined that it would not be in the Fund's best interests to do so and that he alone bore the risk that events occurring between the transfer of the stock and either its sale or the purchase of the yacht would reduce the value of the stock or the yacht respectively. Thus, the taxpayer argues, there was a mere "coincidence" of two transactions and the principles underlying the tax treatment of charitable contributions require separate treatment of these transactions in the absence of an obligation binding the charity to purchase an asset of the contribution. Blake Brief at 7.

Under *Grove v. Commissioner,* 490 F.2d 241 (2d Cir.1973), the taxpayer argues reversal is required. *Grove* is presented to us as in a line of cases including, *e.g., Palmer v. Commissioner,* 62 T.C. 684 (1974), *aff'd on other grounds,* 523 F.2d 1308 (8th Cir.1975),

*acq'd in* Rev.Rul. 78–197, 1978–1 C.B. 83; *DeWitt v. United States,* 204 Ct.Cl. 274 (Ct.Cl.1974); *Carrington v. Commissioner,* 476 F.2d 704 (5th Cir.1973); *Sheppard v. United States,* 361 F.2d 972 (Ct.Cl.1966); and *Granite Trust Co. v. United States,* 238 F.2d 670 (1st Cir.1956). We will first examine whether there was a legally binding agreement in this case, although this point was neither relied upon by the Tax Court nor particularly argued by the Commissioner, because the premise of the taxpayer's argument is that there was no legal obligation whatsoever. We will then address the Tax Court's holding that the understanding between the parties was alone sufficient to justify recharacterization of these transactions, irrespective whether the understanding was legally enforceable.

## II. *The Fund's Obligation to Blake*

■ If there was a legally binding agreement on the Fund's part to purchase the vessel with the entirety of the proceeds derived from the sale of the transferred stock, the taxpayer seems to concede that there would be no contribution here in excess of the fair market value of the yacht at the time of its transfer. *See* 5 J. Mertens, *Law of Federal Income Taxation* § 31.02 at 6 (1980). The existence of such an obligation is determined, of course, with reference to state law. *Helvering v. Fuller,* 310 U.S. 69, 74–75, 60 S.Ct. 784, 787, 84 L.Ed. 1082 (1940); *compare Estate of Gilchrist v. Commissioner,* 630 F.2d 340, 345 (5th Cir.1980) (state law determines type of property interest, federal law determines which incidents of ownership are taxable); *Wolder v. Commissioner,* 493 F.2d 608, 612 (2d Cir. 1974) (state law determines legal rights to property, federal law controls characterization for tax purposes).

In terms of choice of law, it would appear that the law of New York, the place where the Fund was incorporated, where the meetings were held, to where Blake wrote his letter of March 17 informing the Fund of the stock transfer, and from where the Superintendent of the Merchant Marine Academy wrote a letter expressing interest

in the acquisition of the vessel, would apply.[4] *See Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158, 1161–62 (2d Cir.1978) (under New York conflicts law, construction and validity of contract governed by law of state with most significant contacts and greatest interest), *cert. denied,* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *Molinar v. Western Electric Co.,* 525 F.2d 521, 527 (1st Cir.1975), *cert. denied,* 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748 (1976) (under Massachusetts conflicts law, validity of contract governed by law of state where contract was made); *Grand Sheet Metal Products Co. v. Aetna Casualty & Surety Co.,* 500 F.Supp. 904, 908–09 (D.Conn.1980) (under Connecticut conflicts law, validity and construction of contract governed by law of state where contract was made or where contract is to be performed or have "operative effect"). To be sure, the difficulties of characterization present to some degree in virtually all conflicts questions are magnified where, as here, there is no written instrument or other record of an explicit agreement between the parties. It is, we suppose, therefore possible that the substantive law of Massachusetts, where the letters acknowledging the transfer and sale of stock and informing Blake of the Fund's decision to purchase the yacht were sent, might apply. It is also possible, although it seems unlikely, that the substantive law of Connecticut, where Blake apparently resided in February of 1975 and where the letter written by the Superintendent of the Merchant Marine Academy expressing interest in the yacht was sent, might apply.

We need not decide which of the three states' law would govern, however, because we are certain that each state would consider the Fund legally obligated to purchase the America under a theory of promissory estoppel on the facts of this case. Under this theory, a mere gratuitous promise by the Fund that it would purchase the America became legally binding when Blake acted in reliance on such an assurance. The doctrine has long been recognized in New York. *See Planet Construction Corp. v. Board of Education,* 7 N.Y.2d 381, 384–86, 165 N.E.2d 758, 760–61, 198 N.Y.S.2d 68, 71–72, (1960); *Spiegel v. Metropolitan Life Insurance Co.,* 6 N.Y.2d 91, 95, 160 N.E.2d 40, 42, 188 N.Y.S.2d 486, 488–89 (1959); *I. & I. Holding Corp. v. Gainsburg,* 276 N.Y. 427, 434, 12 N.E.2d 532, 535 (1938); *Allegheny College v. National Chautauqua County Bank,* 246 N.Y. 369, 373–74, 159 N.E. 173, 175 (1927); *Hamer v. Sidway,* 124 N.Y. 538, 27 N.E. 256 (1891). Massachusetts also protects foreseeable and justifiable reliance by invoking the doctrine as a substitute, so to speak, for consideration. *See Allen v. Rakes,* 359 Mass. 1, 4–5, 267 N.E.2d 628, 630 (1971); *McLearn v. Hill,* 276 Mass. 519, 524, 177 N.E. 617, 619 (1931); *Wood v. Danas,* 230 Mass. 587, 594, 120 N.E. 159, 162 (1918). Similarly, under Connecticut law, a promise otherwise unenforceable is held binding if the promisee incurs an expense or suffers some detriment in reliance on the promise. *See Wolfe v. Wallingford Bank & Trust Co.,* 124 Conn. 507, 512–13, 1 A.2d 146, 149–50 (1938); *Finlay v. Swirsky,* 103 Conn. 624, 631, 131 A. 420, 423 (1925); *First New Haven National Bank v. Statewide Motors, Inc.,* 33 Conn.Sup. 579, 581–82, 363 A.2d 751, 753 (Conn.Super.Ct. 1976) (per curiam); *Hebrew University Association v. Nye,* 26 Conn.Sup. 342, 346–47, 223 A.2d 397, 400 (Conn.Super.Ct.1966).

---

**4.** Before determining which state's substantive law controls on the question whether there was an obligation, it is necessary to consider what choice of law rule applies. In diversity cases a federal district court looks to the choice of law rules followed by the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Where jurisdiction is based on some ground other than diversity, however, the applicability of *Klaxon* is unclear. *See, e.g., United Automobile Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 705 n. 8, 86 S.Ct. 1107, 1113 n. 8, 16 L.Ed.2d 192 (1966) (not deciding whether *Klaxon* applicable in a suit under § 301 of the Labor Management Relations Act); R. Weintraub, *Commentary on the Conflict of Laws* § 10.5C, at 572–73 (2d ed. 1980). We need not decide whether a uniform federal choice of law rule should apply in a case like this, *see Siegelman v. Cunard White Star, Ltd.,* 221 F.2d 189, 192–93 (2d Cir.1955), because it appears that the cases from the three states to whose laws we might reasonably turn point to the same result.

The taxpayer argues that no legal obligation arose on the charity's part to purchase the vessel because he "gave the shares . . . absolutely, parting with all control over them." But, far from negating the existence of an obligation, the transfer itself gave rise to an obligation, under the decisions cited above, if the taxpayer made the transfer in reliance upon an assurance that the charity would use the proceeds of the asset for a specific purpose. *See Allegheny College v. National Chautauqua County Bank, supra.* Although the taxpayer maintains that the charity made no commitment upon which the reliance in the form of the transfer could be premised, the Tax Court's findings are to the contrary. The Tax Court concluded, upon the record in its entirety, that the transfer of stock was made "with the understanding that the stock would be sold, that the yacht would be turned over to the fund, and that virtually all of the proceeds of the sale of the stock would end up in [the taxpayer's] hands." The individual who served as the Fund's negotiator in dealing with Blake was unable to testify at trial as to any express oral agreement between the Fund and Blake, but a Fund director testified that it was the Board's understanding that the negotiator had agreed that the stock proceeds would be used to "purchase" the vessel. That the Board's "understanding" accurately reflected an understanding between Blake and the Fund's negotiator is supported by the fact that, as of the March 13, 1975, meeting, the directors agreed to take "such steps as necessary to acquire the YACHT AMERICA" and were aware that "further negotiation packages to acquisition [were] to be discussed." Further support is provided by the minutes of the Fund's April 8, 1975, meeting, which note the approval of a motion "to accept the generous donation of Mr. P. Blake to be used for the purchase of the yacht America and her maintenance." Finally, Blake himself testified on direct examination that he would not have made a donation as substantial as the amount of the market value of the stock he transferred "except for the boat thing."

On the basis of the Tax Court's factual findings as to the understanding between the taxpayer and the charity, we have little difficulty concluding that Blake would have had an enforceable cause of action under a promissory estoppel theory. We have in the past relied on this doctrine, as codified in Section 90 of the Restatement (Second) of Contracts, *see Porter v. Commissioner,* 60 F.2d 673, 675 (2d Cir.1932), *aff'd,* 288 U.S. 436, 53 S.Ct. 451, 77 L.Ed. 880 (1933), and we believe that the courts of New York, Massachusetts, and Connecticut would do likewise on these facts. *See Borden v. Chesterfield Farms, Inc.,* 27 A.D.2d 165, 168, 277 N.Y.S.2d 494, 497 (App.Div.1967) (concurring opinion); *Allen v. Rakes, supra; Hebrew University Association v. Nye, supra.* The same public policy considerations that support the enforcement of promises made by individuals to charitable organizations also support the enforcement of promises made by a charity in connection with a contribution. As the former Assistant Superintendent of the Merchant Marine Academy and twenty-five-year director of the Fund testified at trial, if the Fund had not purchased the America with the proceeds of the stock, if it "had simply taken Mr. Blake's money and run," the "gifting of future yachts would have been severely jeopardized." We therefore reject the taxpayer's contention that the Fund was not legally obligated to "purchase" the yacht, and this is enough to satisfy the case law referred to us. *Grove v. Commissioner, supra,* and the other cases cited by the taxpayer for the proposition that there must be a legally binding obligation on a charity's part before a transfer that is ostensibly a contribution can be recharacterized are therefore simply inapposite because there was a legal obligation here.

III. *The "Understanding" Between Blake and the Fund*

The Tax Court found as a factual matter that there existed an "understanding" between Blake and the Fund with respect to the disposition of the proceeds the Fund realized from sale of the stock. Even if this understanding fell short

of a legal obligation, it amounted to more than mere wishful thinking on the taxpayer's part and thus refutes the contention that these transactions were merely coincidental. It also serves to distinguish this case from *Grove v. Commissioner, supra,* if not from all the other cases the taxpayer cites here. In *Grove,* this court relied on the Tax Court's finding there was not even an informal agreement that the charity would deal with the contributed asset in a manner providing a tax benefit to the taxpayer. 490 F.2d at 247. The majority opinion in *Grove* declined to infer an understanding from a pattern of activity benefiting the taxpayer in the "absence of any supporting facts in the record," *id.* at 248, an approach with which the author of this opinion took issue. *Id.* at 248–50 (Oakes, J., dissenting). But this case does not present us with the same difficulty. Here, the Tax Court found an understanding and we are quite firmly convinced that this finding was not clearly erroneous. Our review of the record satisfies us that "[t]here was evidence to support the findings of the Tax Court, and its findings must therefore be accepted." *Commissioner v. Court Holding Co.,* 324 U.S. 331, 333, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). *See also Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 1199, 4 L.Ed.2d 1218 (1960).

Another case relied on by the taxpayer, *Carrington v. Commissioner,* 476 F.2d 704 (5th Cir.1973), involved a contribution of stock followed by a redemption of the stock in exchange for another asset held by the taxpayer. *Carrington* held that if there is a bona fide surrender of "dominion and control" of an asset by a taxpayer to a charity, then, for tax purposes, the transfer is a gift and the taxpayer is entitled to treat the transfer as a charitable contribution. But in reaching this conclusion the *Carrington* court noted that there was "neither evidence of, nor suggestion that, there was a prior *obligation* on the part of the [charity] to redeem this stock." *Id.* at 709 (emphasis in original). We read the use of the underscored word "obligation" in *Carrington* —which was written by a distinguished senior judge from this circuit sitting by designation on the Fifth Circuit—as synonymous with the use of the word "understanding" in *Grove. Grove* relied on *Carrington* for the proposition that if a donor makes "a valid, binding, and irrevocable gift of ... shares to [a charity], it would be the purest fiction to treat the redemption proceeds as having actually been received by" the taxpayer. *Grove,* 490 F.2d at 246. In this case, by contrast, it would be "the purest fiction" to treat the proceeds of the stock as if they were not actually received by the taxpayer when they were in fact returned to the taxpayer almost immediately after the transfer in "exchange" for an asset that, as the record indicates, had a market value substantially less than the value of the stock proceeds.

We see this case as analogous to an earlier Fifth Circuit case, *United States v. General Geophysical Co.,* 296 F.2d 86 (5th Cir. 1961), *cert. denied,* 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962), that *Carrington* distinguished. *General Geophysical* disallowed a stepped-up basis for depreciable corporate assets that had been transferred to corporate shareholders in exchange for their stock and then repurchased on the same day by the corporation at their fair market value. Writing for the court, Judge Wisdom pointed out that "[e]ven the surrender of [the corporation's] legal title" to the assets was insufficient to establish that the corporation had truly terminated its ownership where the surrender "was made under circumstances creating a strong expectation that [the property] would be returned shortly." 296 F.2d at 89. Judge Wisdom went on to note that although

> the stockholders may have had complete legal freedom to refuse to resell the assets to the corporation ... there was almost no likelihood that they would do so. It was a foregone conclusion that they would resell the assets to someone, since the very reason for the original redemption was that the stockholders did not wish to continue ownership of the assets and management of the business.

*Id.*

■ Here, too, even if the Fund would have had "complete legal freedom to

refuse" to buy the America from the taxpayer—a freedom that, for reasons above stated, we do not think existed—"there was almost no likelihood that they would do so." The Fund directors knew that, if they reneged in the face of Blake's strong "expectation," they would probably never get another vessel donation. Reneging on understandings of this sort is scarcely the stuff of which charitable loyalty is made. Under a reading of *Grove* and *Carrington* most favorable to the taxpayer, we have here a transaction that is, as the Fifth Circuit's denial of a petition for rehearing in *General Geophysical* points out, analogous to a Clifford trust, insofar as the application of federal tax law produces consequences different from those that might follow under state law. Thus, whether or not the "understanding" the Tax Court found here was legally enforceable under state law, we hold that where there is an understanding that a contribution of appreciated property will be utilized by the donee charity for the purpose of purchasing an asset of the contributor, the transaction will be viewed as a matter of tax law as a contribution of the asset—at whatever its then value is—with the charity acting as a conduit of the proceeds from the sale of the stock. This makes the taxpayer/putative-donor taxable on the gain of the stock though entitled to deduct the value of the asset given, whatever that value in fact is. Here, as in *Grove*, we rely on "the totality of the facts and circumstances," 490 F.2d at 247, recognizing that the "maxim that substance must prevail over form" only "marks the beginning, not the end, of our inquiry." *Id.* at 246. *See also* 3 J. Mertens, *Law of Federal Income Taxation* § 20.161, at 730 (1981). Roscoe Pound presciently remarked, "all such 'maxims' should rather be called 'minims' since they convey a minimum of information with a maximum of pretense." *Sheppard v. United States*, 361 F.2d 972, 977 n. 9 (Ct.Cl.1966) (attributing phrase to Pound), *quoted in Grove*, 490 F.2d at 246.

We are aware that *DeWitt v. United States*, 204 Ct.Cl. 274 (Ct.Cl.1974), stated flatly that if there are no "[p]rearrangements, understandings or tentative planning between the involved parties which . . . impose legal obligations on them either to sell or purchase the gift after it is given," 204 Ct.Cl. at 299, a transfer may not be denied contribution status. To the extent that *DeWitt* is inconsistent with what we have said above, we disagree. We note, however, that in a more recent decision, *Basic Inc. v. United States*, 549 F.2d 740 (Ct.Cl.1977) (per curiam), the Court of Claims explained its holding in *DeWitt* as hinging on the fact that the "reacquisition of the property [by the taxpayer] was an expectation and not a certainty . . . [and] the gift [therefore] stood the test of independent transaction." *Id.* at 748. In light of *Basic*'s elaboration of *DeWitt,* our disagreement with that decision reflects only our conclusion that "*for tax purposes* there was not a sufficient severance of the [taxpayer's] ownership over the assets for the transaction to create the tax consequence" contended for here. *United States v. General Geophysical*, 296 F.2d at 90 (on petition for rehearing) (emphasis in original). *See generally* Hobbet, *Charitable Contributions—How Charitable Must They Be?,* 11 Seton Hall L.Rev. 1 (1980).

More troublesome is the case of *Palmer v. Commissioner,* 62 T.C. 684 (1974), *aff'd on other grounds,* 523 F.2d 1308 (8th Cir.1975), which held that even an expectation of a stock redemption would not warrant denying charitable contribution status. The Service, in Revenue Ruling 78–197, 1978–1 C.B. 83, acquiesced in *Palmer,* stating that it would treat redemption proceeds under facts similar to *Palmer* as income to the donor "only if the donee is legally bound, or can be compelled by the corporation, to surrender the shares for redemption." *Id.* The Service cited both *Grove* and *Carrington* as support for its position; what we have said above indicates our belief that this Ruling reads too much into those decisions. Where there is, as here, an expectation on the part of the donor that is reasonable, with an advance understanding that the donee charity will purchase the asset with the proceeds of the donated stock, the transaction will be looked at as a unitary

one. A wooden view that would require legal enforceability of an understanding or obligation to purchase the asset contemplated to be donated *ab initio* is not what the tax law contemplates. At least, this circuit will not take it to do so.

Judgment affirmed.