T.C. Memo. 2004-271

UNITED STATES TAX COURT

DAVID C. ROARK and ESTATE OF IRENE ROARK, DECEASED,
DAVID C. ROARK, EXECUTOR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9231-02, 5105-03.    Filed November 29, 2004.

<u>Earl S. Howell</u> and <u>Timothy R. Simonds</u>, for petitioners.

<u>Edsel Ford Holman, Jr.</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  In 1998, David Roark gave $160,000 to a
charity, the National Community Foundation ("NCF").  NCF sent him
letters in return saying that "no goods or services have been
provided in connection with this gift," and he took his
contributions as a deduction.  But NCF used the money to pay the
premiums on a $2.2 million insurance policy on Roark's life that

was owned by a trust benefiting the Roark family. Both the trust and NCF were entitled to portions of the policy's death benefit, the trust entitled to by far the larger share.

In Addis v. Commissioner, 118 T.C. 528 (2002), and then again in Weiner v. Commissioner, T.C. Memo. 2002-153, we ruled that the deductions in such arrangements--known as "charitable split-dollar life insurance agreements"--foundered on section 170(f)(8).[1] This section requires substantiation of a charitable contribution with a written acknowledgment by the charity stating whether the donor received "any goods or services in consideration, in whole or in part," for his donation. Sec. 170(f)(8)(B)(ii). In both Addis and Weiner, we held that letters from a charity stating that no consideration was received were inadequate substantiation if the charity was paying premiums for life insurance benefiting the donor or his family. Both Addis and Weiner have now been affirmed on appeal. Addis, 374 F.3d 881 (9th Cir. 2004); Weiner, 102 Fed. Appx. 631 (9th Cir. 2004). In this case, we follow those rulings and again uphold the Commissioner's disallowance of the claimed deduction.

FINDINGS OF FACT

This case features three characters: (1) petitioner David

---

[1] Section references are to the Internal Revenue Code of 1986, as amended.

Roark;[2] (2) American Express, and (3) NCF, the recipient of the disputed contributions.

David Roark is a lifelong Tennessean (including when he filed the petition in this case).  His life has been marked by success in business and a consistent devotion to charity.  After graduating from college, he worked for 25 years at United Hosiery Mill in East Chattanooga, Tennessee.  He came to recognize an untapped demand for fabric dyeing, and in 1982 set out with a few colleagues to start a business to contract with manufacturers to dye their fabric.  The business, later known as Skyland International, flourished.  Mr. Roark and his wife, who had tithed their gross income every year for decades, used their prosperity to increase their already generous donations to both their local church and other Christian charities.  Mr. Roark became especially generous with both time and money to the North Chattanooga Camp of the Gideons.

American Express is a well-known financial services company. One of its subsidiaries is IDS Life Insurance Company.  Robert Pippenger is a Senior Financial Adviser at American Express and has long served as the Roarks' personal financial adviser.  He also managed the Roarks' investments, and knew their financial goals and inclination toward charitable giving.

---

[2] Mr. Roark and his wife filed joint returns.  Mrs. Roark died in 1999, and he filed the petition both for himself and in his capacity as executor of her estate.

NCF, the third major player in this case, is a section 501(c)(3) charitable organization based in Brentwood, Tennessee. It receives money from both its own investments and donations. One of the ways it receives donations is through "donor-advised accounts," also known as "individual foundations." Donors to these foundations contribute money or other property to a special individual account, and they can direct NCF to contribute up to 75 percent of the principal and interest from that account to other charities of their own choosing. The remaining 25 percent of each account goes to the charitable programs of NCF, which focus on Christian evangelical and humanitarian services.

Pippenger first became aware of charitable split-dollar life insurance plans in 1997. A conscientious investment adviser, he studied the arrangement by attending, at his own expense, seminars put on by American Express; he also performed his own due diligence independently. He came to see these plans as an opportunity to benefit his clients who were interested in estate planning: since proceeds of a life insurance contract that are paid by reason of the insured's death are excluded from income, sec. 101(a)(1), sharing the cost of the premiums with a charity in a way that created current tax deductions would obviously be attractive. Sometime in early 1998 Pippenger met with the Roarks to discuss the value of Mr. Roark's business, and the potential taxes that his estate would face upon his death. Pippenger told

the Roarks that this charitable split-dollar arrangement would be a good fit for them since it would further their philanthropic goals, as well as helping to provide for Mr. Roark's family after he died. The Roarks agreed, and Pippenger began putting the deal in place in April 1998.

On April 13, 1998, Mr. Roark took the first step by opening a donor-advised account with NCF, to be called the David C. Roark Foundation. In keeping with NCF's practice, Mr. Roark was allowed to choose which charity would get 75 percent of the distribution from his Foundation, and he picked the North Chattanooga Gideons Camp. The Roarks then created the David Roark Revocable Life Insurance Trust on April 16, 1998. Mr. Roark, and Mrs. Roark in her capacity as trustee, applied to IDS Life for a $2.2 million insurance policy on Mr. Roark's life, naming the Trust as beneficiary. Mr. Roark was both the grantor of the Trust and its beneficiary during his lifetime. Mrs. Roark was the Trust's beneficiary if she survived her husband; the remainder beneficiaries were the Roarks' children.

Mrs. Roark, as trustee of the Trust, sent a letter to Curtis Calihan, NCF's Executive Director. The letter offered NCF an option to buy a term insurance death benefit in the insurance policy through the Roark Foundation. NCF's chief counsel, Mark Absher, testified that NCF applied stringent criteria to the life insurance investments it was offered--NCF insisted on a

guaranteed right to a fixed permanent and primary portion of the death benefit, for instance.  The proposed rate of return on the investment also had to be "acceptable".  The Roarks' proposal apparently met NCF's criteria, and so NCF and Mrs. Roark signed a Charitable Legacy Plan Agreement shortly thereafter.

The Plan Agreement called for Mr. Roark to donate large sums of money to the Roark Foundation at NCF.  NCF could then choose from among three options:

1.  <u>If NCF paid no premiums</u>.  The Plan Agreement carefully gave NCF this option, but made clear that NCF's death benefit would then "be null and void."

2.  <u>If NCF chose to pay the premiums</u>.  The Plan Agreement contemplated that NCF would pay the premiums on an accelerated timetable, with all of them paid within five years.[3]  If NCF chose to make all the payments, it would be entitled to $489,000 of the $2.2 million death benefit, and the "unearned premium

---

[3] The Plan Agreement called for Roark to donate the following sums to NCF:

|       |           |
|-------|-----------|
| 1998: | $240,000  |
| 1999: | 165,000   |
| 2000: | 25,000    |
| 2001: | 25,000    |
| 2002: | 25,000    |

Each year, NCF had the option of paying sums equal to Roark's donations as premiums on the insurance policy.

amount value."[4]   The $489,000 death benefit, plus the unearned premium account value, would be paid to the Roark Foundation, with 75 percent ultimately going to the Gideons, but NCF would be able to use the remaining 25 percent for its own programs.  The Roark Trust would receive at least the remaining $1.711 million of the death benefit.[5]

3.   <u>If NCF made some of the payments but then stopped</u>. Under this option, NCF's portion of the death benefit would be fixed at $489,000 until the accrued premiums earned were equal to NCF's payments.  NCF's interest in the policy would then end, but if the Trust and NCF agreed to terminate the policy while some of the premiums remained unearned, NCF would at least get those premiums back.

Pippenger was also involved in the arrangement.  Whenever Mr. Roark sent in money to NCF, Pippenger would fill out and send

---

[4] As is common with insurance companies, IDS Life earns its premiums by accepting risk for a given time.  It thus "earns" accelerated premiums only over that time.  The "unearned premium account value" was the excess of the premiums NCF had paid over the amount IDS Life had earned.

[5] The Roark Trust would actually receive the larger of the death benefit or a percentage of the "policy value."  In the early years of the policy, the death benefit would almost certainly be larger than the policy value.  However, as with most universal life policies, the longer the Roarks' policy was in effect, the more likely it would be that the accounts into which the accelerated premiums were invested would grow in value and eventually exceed the death benefit.  Under the Plan Agreement, this buildup in value would accrue entirely to the Trust's benefit, not NCF's.

in an NCF form identifying himself as "charitable emissary," and reminding NCF of the details of the insurance policy's deadlines and mailing address for payment.

By late April 1998, then, all the parts of a charitable split-dollar life insurance arrangement were assembled and in place.  The policy was purchased, the Trust formed, the Foundation created, the Plan Agreement signed, and even an emissary appointed.  Roark began sending in his contributions.

Everything went smoothly at first.  By November 1998, Roark had contributed a total of $160,000.  After each payment, NCF sent a letter to him acknowledging his contribution.  Each was signed by either NCF's chief financial officer or one of its vice presidents.  Each contained this language:

> I further acknowledge that, New Life Corporation of America [NCF's legal name] is a charitable organization with the meaning of Section [170(c)] of the Internal Revenue Code, and is listed as such in the current revision of IRS Publication 78.  In accordance with IRS regulations, no goods or services have been provided in connection with this gift.

NCF used the money to pay $158,000 to IDS Life for premiums on the policy in 1998 (keeping $2,000 in administrative fees), with the first $48,000 on May 15, and the remaining $110,000 on December 2.  Roark then made one additional contribution of $20,000 on December 23, 1998.  He again received a letter from NCF acknowledging the contribution, and the letter again stated that "no goods or services had been provided in connection with

the gift." On January 29, 1999, Mrs. Roark passed away. The Roarks' daughter, Connie R. Perrin, became the successor trustee of the Roark Trust, and the arrangement continued.

The only problem was that the Roarks were far from alone; split-dollar agreements had become so widespread that Congress stepped in. In February 1999, bills were introduced in both the Senate and the House to force charities to pay a 100-percent excise tax on any amounts they had paid on life insurance policies covering their donors. Because of the possibility that the legislation would be made retroactive to the date it was introduced,[6] NCF stopped making payments on all the split-dollar agreements it had. As a result, NCF never made a premium payment corresponding to Roark's last $20,000 contribution.

Once NCF stopped paying premiums, its death benefit in the Roark policy was fixed under the Plan Agreement at $489,000. As IDS Life was continuously earning the accelerated payments, however, the amount of money that NCF stood to get if the policy were terminated began to shrink. And once IDS Life earned all of the accelerated payments, NCF's $489,000 interest would disappear.

NCF faced similar problems with the other split-dollar

---

[6] The legislation passed, and can now be found in section 170(f)(10). Tax Relief Extension Act of 1999, Pub. L. 106-170, sec. 537, 113 Stat. 1936. Parts of it were indeed made retroactive to Feb. 8, 1999, the date of introduction.

agreements it had made, so it began sending letters to all its contributors encouraging them to terminate their policies. If a contributor agreed, NCF would be able to recover the unearned premiums. But without a contributor's agreement to terminate, NCF's investment was at risk. If the contributor died quickly, NCF would receive a great deal of money; but if he outlived the time it took for the life insurance company to earn its premiums on NCF's accelerated payments, NCF would get nothing.

Roark got such a letter, but he never agreed to terminate the policy. He also never contributed any more money to NCF once the legislation was introduced. But he did make another payment to IDS Life in December 2001 to prevent the insurance policy from lapsing. Then, in March 2003, he reduced the policy's death benefit from $2.2 million to $1.1 million. This guaranteed that the Trust would receive at least some death benefit even if he never paid another premium.

If the payments to NCF are counted, the Roarks contributed a total of $220,966 to charity during 1998. Due to rules that set an annual ceiling on charitable contribution deductions, sec. 170(d)(1), the Roarks deducted only $166,031 in 1998 and carried over the remainder to 1999. The IRS issued a notice of deficiency for the 1998 and 1999 tax years that disallowed the $180,000 in contributions to NCF. The Commissioner later reduced the disputed amount because NCF never made a payment on the

insurance policy with the last $20,000 that Roark sent it.  The $160,000 that is still in dispute is the total of $158,000 that NCF made toward the insurance policy, and the $2,000 Roark sent to NCF for administrative fees.

## OPINION

The Commissioner argues that the $160,000 in dispute should be disallowed entirely because it was not properly substantiated by NCF under section 170(f)(8) and section 1.170A-13(f), Income Tax Regs., and because (applying the step-transaction doctrine) the series of interrelated transactions was in substance an attempted gift of a partial interest in a life insurance policy, and so not deductible under section 170(f)(3).  He also claims that the deduction must at the very least be limited to the excess of Roark's contributions over the economic benefit he received.

As we noted at the outset, we have already decided two very similar cases on the first ground that the Commissioner suggests, and our decisions were in both cases affirmed.  Addis v. Commissioner, 118 T.C. 528 (2002), and Weiner v. Commissioner, T.C. Memo. 2002-153.  Unless these cases can be distinguished, they govern.[7]

_____

[7] Roark argues in his brief that Addis was not binding on this Court while it was pending an appeal.  This is wrong.  We are bound by the reviewed decisions of this Court.  Groetzinger v. Commissioner, 82 T.C. 793, 797 n.11 (1984), affd. 771 F.2d 269
(continued...)

In <u>Addis</u>, as here, the taxpayer negotiated a charitable split-dollar life insurance contract. The insurance policy there also was owned by a trust, whose beneficiaries were also the taxpayer's family. The taxpayer in <u>Addis</u> also set up a foundation with a charity. She also donated money to the charity, and the charity also issued an acknowledgment letter with language designed to meet section 170(f)(8)'s substantiation requirements; i.e., that the charity "did not provide any goods or services to the donor in return for the contribution." That charity also used the donated funds to pay the premiums on a life insurance contract, entitling it to a percentage of the proceeds upon the taxpayer's death.

Our analysis in <u>Addis</u> centered on the substantiation requirement. Taxpayers may deduct cash contributions that are made to a qualified donee organization. Sec. 170(a). If a taxpayer contributes $250 or more at one time, the donee organization must substantiate the donation in writing for the deduction to be allowed. Sec. 170(f)(8).

This writing must specify whether the donor received or expected to receive any goods or services from the charity in

---

[7](...continued)
(7th Cir. 1985). There are exceptions, <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), but they do not apply here. Now that our previous opinions in <u>Addis</u> (and <u>Weiner</u>) have been affirmed, we of course have no reason not to follow them.

consideration for the donation, as well as an estimate of their fair market value.  Sec. 170(f)(8)(B); sec. 1.170A-13(f)(2), (6), Income Tax Regs.  According to the Commissioner, the letters NCF sent Roark fail to meet the terms of the statute and regulation because Roark did expect that NCF would pay the premiums, and the payment of those premiums was valuable to him--in other words, it was not true, as NCF wrote in its letter, that "no goods or services have been provided in connection with this gift."

In countering the Commissioner, Roark first argues that NCF was not legally obliged to pay the premiums.  Whether NCF was under a legal obligation might be relevant here under the step-transaction doctrine.  (Though perhaps not even then.  See Blake v. Commissioner, 697 F.2d 473, 480 (2d Cir. 1982), affg. T.C. Memo. 1981-579.)  The regulation that applies here, however, makes clear that the key question is whether a donor expected to receive consideration, not whether he was entitled to receive it: "A donee organization provides goods or services in consideration for a taxpayer's payment if, at the time the taxpayer makes the payment to the donee organization, the taxpayer receives or expects to receive goods or services in exchange for that payment.  Sec. 1.170A-13(f)(6), Income Tax Regs. (emphasis added).  We look for a quid pro quo, not a possible cause of action.

Perhaps anticipating this, Roark tries to distinguish his case from Addis's by stating--correctly--that Addis admitted that she expected the charity in her case to pay the premiums. Addis 118 T.C. at 535. Roark, in contrast, testified that he had no idea what was going on with NCF and the charitable split-dollar life insurance plan, and that every time he got information about it, he simply turned it all over to Pippenger.

We do not find this disavowal credible. The idea for this deal, after all, came from Pippenger--his financial, not his charitable, adviser. Roark had to have realized that the intricacy of the plan, plus the fact that it was being marketed so extensively by American Express, suggested that as a practical matter NCF would of course use money it got under such plans to pay for insurance and not just add to its endowment. Failure to do so would have been a massive denial of its donors' expectations, as NCF itself recognized when it let loose with its letterwriting surge after Congress began considering the excise tax on premiums.

We also find that NCF's payment of the premiums was something of value to Roark. Of the policy's $2.2 million death benefit, a maximum of only $489,000 would go to NCF. The Trust, which was set up by Roark and whose beneficiaries were his wife and children, would receive the other $1.711 million. The Trust would thus take 78 percent of the total death benefit, while NCF

would only get 22 percent. Even if the Trust had agreed to terminate the policy early, NCF would merely get back the unearned premiums that it prepaid. In Addis, we reasoned that if the charity's premium payments were big enough to keep the policy viable, and the family trust itself would receive a significant portion of the death benefit, the value of those payments to the trust had to be greater than zero.

The facts of this case show that Roark was getting an even better deal than the taxpayers in the other split-dollar cases that we've decided. In both Addis and Weiner, the charity would have received a greater proportion of the insurance proceeds than the families' trusts. Here, the proportions were reversed: the Roark family, through the Trust, would actually receive more money than NCF, and so we easily find that Mr. Roark would receive value as a result of NCF paying the premiums. And while it is true that, after Mrs. Roark's death, it was the Roark's daughter who was trustee, we reasoned in Weiner, that this change in which relative would collect on the policy did not change our conclusion that the donor "expected that he would benefit from his payments * * *."

Roark does of course have the letter that NCF sent him, stating that he received nothing of value in exchange for his contributions. And it is true that a taxpayer ordinarily may rely on a charity's estimate of fair market value. Sec. 1.170A-

1(h)(4)(i), Income Tax Regs.  But if a taxpayer knew or should have known that a charity's estimate of the fair market value of the consideration it provided was not reasonable, he cannot take the deduction.  Sec. 1.170A-1(h)(4)(ii), Income Tax Regs.  And that's the situation here. Even if Roark did not have actual knowledge that NCF would pay the policy premiums, he should have known.  He was a sophisticated businessman, and all the paperwork was available to him.  He signed much of it.  All the letters were sent to him.  It would have been simply unreasonable for him to conclude that this split-dollar agreement did not benefit him and his family at all.

In the end, then, this case is indistinguishable from <u>Addis</u>. Though NCF wrote that "no goods or services have been provided in connection with this gift" each time Roark sent in money, he knew or should have known that he would receive some value in return. Since the donation was not properly substantiated under section 170(f)(8), and the Roarks unreasonably relied on it contrary to the provisions of section 1.170A-1(h)(4), Income Tax Regs., we hold that they may not deduct the $160,000 he contributed to NCF. We need not reach any other arguments, but because the Commissioner conceded a $20,000 increase to the Roarks' charitable deduction,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.